WILLIAM S. HANCOCK, COMPTROLLER, ET AL., PLAINT-IFFS IN ERROR v. THE SINGER MANUFACTURING COM-PANY, DEFENDANT IN ERROR.

Argued March 7 and 8, 1898—Decided November 14, 1898.

1. The exemption of the shares of stock of an incorporated company, in the hands of stockholders, from "any tax or impost whatsoever," also exempts the capital stock of the company from taxation or impost.
2. The language of the exempting clause in this case had previously received a judicial construction which gave it this comprehensive effect, and it must be presumed that it was used with that meaning.
3. The word "impost" in the Singer charter includes every enforced contribution from the company to the public treasury.
4. This court having decided that a franchise tax imposed upon this company in 1891 was illegal by reason of the contract of exemption in its charter, the question of its liability for a like tax in a subsequent year is *res adjudicata*.

---

On error to the Supreme Court.

For the plaintiffs in error, *John P. Stockton.*

I. It is settled law in this state that the license fee required by the act of the legislature, approved April 18th, 1884, entitled "An act to provide for the imposition of state taxes upon certain corporations, and for the collection thereof," and the supplement thereto, is not a tax on property, and that it is not in violation of article 14, section 7, paragraph 12, of the constitution.

In the case of *Standard Underground Cable Co., appellant, Attorney-General, respondent*, 1 *Dick. Ch. Rep.* 270, the

VOL. XXXIII.    19

section of the act under which the tax is imposed is examined, and it is held to be constitutional on the ground that it is not a property tax. Mr. Justice Knapp, in delivering the opinion of the Court of Errors, says: "But it is objected that this law, if it be construed so as to uphold the tax against the appellant, is violative of that provision of the amended constitution of this state, found in article 4, section 7, paragraph 12, which provides 'that property shall be assessed for taxes under general laws, and by uniform rules, according to its true value.' The tax, payment of which is sought to be enforced by this proceeding, does not fall within that constitutional provision.

"The power of the legislature to impose taxes on persons, property, business and franchises is unlimited, save only by such restrictions upon the exercise of that power as are found in the organic law, or such as are inherent in the nature of the subject.

"The fault of this position is the assumption that this tax is one upon property. Such, manifestly, is not the case. The law in question imposes a tax on certain corporations by way of a license for exercising corporate franchises. It is declared to be such tax by the act, and, although it is laid on this class of corporations with respect to the capital stock, the tax possesses the legal quality of a license or franchise tax. *Evening Journal Association* v. *State Board of Assessors,* 18 *Vroom* 26 ; *Cooley Tax.* (2d ed.) 379, and cases cited.

"Upon the power of the legislature to impose such a tax there exists no restriction in our constitution. As a license or franchise tax, it is not within the equality clause of the constitution referred to." *Trenton Saving Fund* v. *Richards,* 23 *Vroom* 156.

In the case of *Lumberville Delaware· Bridge Co.* v. *State Board of Assessors,* 26 *Vroom* 529, it appeared that the bridge company had been chartered by the State of New Jersey and also by the State of Pennsylvania; that the boundary line was the middle of the river; that the state board of assessors had assessed the license fee under the act,

measuring it by the amount of capital stock of the company issued and outstanding. It was insisted that the State of New Jersey could not impose a tax by way of license fee upon a foreign corporation or its franchises, carrying on its business or any part thereof without the jurisdiction of the State of New Jersey. The court sustained the assessment on the ground that the act simply provided for a license fee for the privilege of existing as a corporation in the state, and was not a property tax. The opinion of Mr. Justice Garrison in this case reviews the decisions in the federal as well as those in the state courts; he cites the opinions of Mr. Justice Bradley and Mr. Justice Field to show that a franchise tax, although it be considered a property tax, if it does not discriminate against citizens of other states, is within the province of the states and no violation of the clause committing to congress the regulation of commerce, but he declares distinctly that the assessment under this act is not an assessment upon property at all. Mr. Justice Garrison says: "In this state we tax each of these so-called franchises. The former, as in the case of the right to own and operate a railroad, is taxed as property having a true value which it is the duty of the state board to ascertain for the purpose of constitutional assessment. On the other hand, the naked right of existing in corporate form is taxed, as in the case before us, not at its true value, as it would have to be if it were property, but at a sum arbitrarily imposed by the legislature as an annual fee, the amount of which is to be computed by reference to the capital of the company as a criterion. It is, in short, a poll tax levied upon domestic corporations for the right to be. Such a tax is not upon property or assets, and does not in any way concern the nature of the business the company may be authorized to carry on."

In those states in the Union having constitutional provisions requiring equality in the taxation of property it is uniformly held that such provisions do not abridge or apply to the legislative power of indirect taxation by taxes on franchises, privileges, trades and occupations. *Cooley Tax.* 176 *et seq.,*

and cases cited; *State Board of Assessors* v. *Central Railroad Co.*, 19 *Vroom* 146, 356.

Mr. Justice Dixon, in delivering the opinion of the Supreme Court in the Singer case, simply affirmed the previous decisions on this subject. He said (28 *Vroom* 441): "The brief of counsel for the prosecutor concedes that the tax is a franchise tax. This has been declared by our courts to be the character of the tax levied upon miscellaneous corporations under the original act of 1884, of which the statute of 1891 is an amendment. *Evening Journal Association* v. *State Board of Assessors*, 18 *Vroom* 36; *Cable Co.* v. *Attorney-General*, 1 *Dick. Ch. Rep.* 270; *Honduras Commercial Co.* v. *State Board of Assessors*, 25 *Vroom* 278. It should be noted, however, that in the act of 1884 the legislature distinctly expressed its intention by calling the charge 'a yearly license fee or tax,' while in the amendment of 1891 it is denominated simply 'a yearly tax.' But, notwithstanding this change of phraseology, the thing, in our opinion, remains the same. This conclusion is, I think, rendered necessary by the rule which enjoins the courts to construe a statute in such sense as will uphold rather than destroy it, for if this tax be not a fee demanded for the exercise of corporate franchises, then it is a mere property tax, and as such is unconstitutional, because assessed according to the 'amount of all capital stock issued and outstanding, and not according to the true value of the property, as our constitution requires.'"

It will be observed that the act of 1892 has inserted the words omitted in the act of 1891 and declares the charge to be a license fee, thus bringing the present case directly under the decisions on the act of 1884.

### An Exemption from "Tax" or "Impost" Does Not Include "License."

The exemption in the charter is in these words: "The real and personal property of the said corporation not actually in fact within the State of New Jersey, and the stock of the said

corporation held or owned by any of its stockholders, shall not be liable to any tax or impost whatsoever."

The opinion of the Court of Errors (29 *Vroom* 638) assumes as an established premise that "impost" includes "every kind of enforced contribution to the public treasury." Indeed, it would be impossible to reach the conclusion the court did without this assumption. It follows, necessarily, that if this assumption is unwarranted the court extends the exemption by placing a meaning on the terms employed which the legislature never intended.

Mr. Justice Van Syckel says the word "imposition" includes "every kind of enforced contribution to the public treasury."

What the charter, in express words, guards against was the laying of an "imposition" of any nature upon the real or personal property of the company without the state.

The word "license" is not mentioned in the opinion. It was not in the act of 1891, but is in the act of 1892 as well as that of 1884.

The opinion of the Court of Errors assumes the whole case in the outset, or else it decides the case on the narrow ground of the omission of the words "license fee" in the year 1891. In either case it is no authority as to the assessment now before us, which is expressly declared to be a "license fee."

Mr. Justice Van Syckel says (29 *Vroom* 434): "It is called a franchise tax and is laid upon the entire capital of the company of $10,000,000. The act calls it a 'license fee,' and the unanimous opinion of the courts of the state had already affirmed the proposition that it was not laid upon property."

The act approved March 17th, 1892, under which this assessment was made, provides that "each telegraph, telephone, cable and express company shall pay to the state an annual license fee or franchise tax, &c.; that all other corporations shall pay an annual license fee or franchise tax of one-tenth of one per centum on all amounts of capital stock issued and outstanding," &c.

The original act of 1884 had called the contribution "a

license fee or franchise tax." The courts of the state upheld the constitutionality of the law on the ground that it was not a property tax.

The Supreme Court had affirmed the tax, under the act of 1891, in the Singer case, on the ground that the omission of the words in that year did not change the character of the license granted. See Mr. Justice Dixon's opinion, 25 *Vroom* 441.

Impost—that which is imposed or levied; a tax, tribute or duty; especially a duty or tax laid by the government on goods imported into a country. *Webs. Inter. Dict.*

Impost (from Latin *impono*)—the tax received by the prince for such merchandises as are brought into any haven within his dominions from foreign nations. It may in some sort be distinguished from customs, because customs are rather that profit the prince maketh of wares shipped out, yet they are frequently confounded. *Cowell.* See this dictionary, title " Customs on Merchandise." 3 *Jac. Dict.* 394.

Impost—a governmental tax; especially a customs duty. *Stand. Dict.*

License—an expression of consent; a permit. *Stand. Dict.*

*Cooley Const. L.* 55 shows what a tax or impost is, and, inferentially, that it is not a license.

The radical origin of the word " impost " fixes its meaning as well as evidences its radical difference from the word " license "—Latin, *licentia*—which signifies permission.

The word " impost" is the past participle of the Latin word *ponere*—to put, place, set, lay or levy, or tax.

Never does the history of the English language show its use, either in or out of court, as a synonym for license, the laws of etymology forbidding such use, these laws having as unquestionable authority in both courts of law and letters.

Furthermore, no statute, no precedent, no general or exceptional use of impost, as a synonym for license, can be found in anglo, legal or etymological literature.

The constitution of the United States, in giving congress

" power to collect taxes, duties, imposts and excises," exhausted all the English synonyms for impost—they being taxes, duties, excises—so that nothing taxable could escape.   This was in the year 1787; more than one hundred years before the Plymouth colony, in 1636, enacted its first license law for liquor-selling, and licenses were known in England in 1116.

Now, if our national constitution makers had supposed license to be synonymous with impost, they would have added it to the synonyms for impost, and not left it for separate legislation.   A lax use of the term " tax " obtains in the expression " license tax," tax meaning, in this construction, the pay-part of the license, quite as a man would say, " My butcher taxed me too much for my roast."   Such use makes a license tax mean a license to sell something on paying the fee.   If our national constitution makers had supposed such use grammatical, they would have gone further than giving congress the only powers of taxation known by them to be such, and included licenses.   Instead of so doing, the constitution authorizes congress " to levy taxes on imports "—in a word, to make imposts—and this constitutional drawing of the line had been accepted by all United States courts as one which clearly separates imposts from licenses, or " license taxes."   All the United States Supreme Court decisions have sharply defined and adhered to this line. ·

Story says : " The word ' duties ' is often used as synonymous with ' taxes,' but is more often used as synonymous with ' customs,' which are taxes levied upon goods and merchandise which one exported or imported."

In this sense duties are equivalent to " imposts," although the latter word is often restricted to duties on goods and merchandise which are imported from abroad.

A license differs from a tax in that it consists of a right granted by competent authority to do an act which, without said authority, would be illegal, as distinguished from a mere rate or sum of money assessed upon the person, property or business of the citizen.   25 *Encycl. L.* 15, and cases cited.

In the ordinary import of the term " impost," however, it

is applied only to charges upon articles brought from a foreign country into the United States.  *Woodruff* v. *Parham,* 8 *Wall.* (*U. S.*) 123 ; *Brown* v. *Maryland,* 12 *Wheat.* (*U. S.*) 419.

In the case of Brown *v.* Maryland, cited in Woodruff *v.* Parham, Chief Justice Marshall said, "although an impost or duty may be considered a tax in its most enlarged sense, yet every tax cannot be understood to mean an impost or duty."

In *Woodruff* v. *Parham,* 8 *Wall.* (*U. S.*) 123, Mr. Justice Miller, in delivering the opinion of the court, reviewed the case of Brown *v.* Maryland, and defined the legal meaning of the word "impost" so clearly and positively that it has never been a disputed question since. He said, "the word 'imports,' as used in the clause now under consideration, is defined both on the authority of the lexicons and of usage to be articles brought into the country ; and 'impost' is there said to be a duty, custom or tax levied on articles brought into the country."

The courts of the United States, because of the use of the word "imposts" in the federal constitution and statutes, have had occasion to construe the legal meaning of the word, and they have, as is above shown, given to it the particular meaning of a tax or tribute, or levy upon goods imported or exported into the country. It was during the expression of this interpretation by the federal courts that the legislature of New Jersey used the word "impost" in the Singer charter. How far this interpretation of the federal court should aid or control this court in weighing the force and meaning of the word, is well stated by Mr. Justice Van Sickel in the case of *Fritts* v. *Kuhl,* 22 *Vroom* 191, as follows :

"The rule is well settled that where a statute or a constitutional provision of doubtful import has been adopted in one state from the statutes or constitution of another state, after a practical construction has been given to the language by judicial decision, it will be presumed that the interpretation adopted in the state from which it is taken has been accepted

as well as the words." *Lessee of Gray* v. *Askew*, 3 *Ohio* 466; *Langdon* v. *Applegate*, 5 *Ind.* 327; *Rigg* v. *Wilton*, 13 *Ill.* 15; *Adams* v. *Field*, 21 *Vt.* 256; *Rutland* v. *Mendon*, 1 *Pick.* 154.

II. The terms of the exemption in section 6 of the charter of the Singer Manufacturing Company do not preclude the state from exacting an annual franchise tax or license fee from this corporation in common with all others.

Under the rule of construction adopted by our own courts and the Supreme Court of the United States, this section, being a contract for exemption from taxation, is to be construed *strictissima juris*, and most strongly against the company, and if the language of the contract be open to any doubt, that construction which is most favorable to the state must be adopted. *Railroad Co.* v. *Maine*, 96 *U. S.* 499; *Railroad Co.* v. *Georgia*, 98 *U. S.* 359; *Louisville Co.* v. *Palms*, 109 *U. S.* 244; *Memphis Co.* v. *Commissioners*, 112 *U. S.* 609; *St. Louis* v. *Iron Co.*, 113 *U. S.* 465; *Chesapeake Co.* v. *Miller*, 114 *U. S.* 176.

The Singer Manufacturing Company received a liberal charter from the state. By the fifth section, the capital stock of the corporation was $1,000,000, with a power to increase or decrease the same at any time to such an amount as two-thirds of the stockholders might deem advisable. The sixth section provided that whenever $500,000 shall have been paid in, the said corporation may organize and proceed to business under this act, and shall immediately thereafter file with the secretary of state of this state a certificate of such payment and organization, whereupon, and not until then, this act shall take effect; "and if and so long as the said corporation shall invest and keep invested in real estate within this state the sum of $500,000, the real and personal property of the said corporation not actually and in fact within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders, shall not be liable to any tax or impost whatsoever."

The evidence shows that the company has actually increased

the original $1,000,000 to $10,000,000, and that the whole amount invested in New Jersey is $1,000,000, so that $9,000,000 of property which has its home in New Jersey, and is legally liable to taxation here as personal property taxable at the residence of the owner, is exempt from taxation. In order that no tax or impost whatever may be levied on this $9,000,000 of property, indirectly, by taxing the stock in the hands of the holder, that stock is exempted from taxation. This is an enormous amount of property to exempt, far beyond what the state could have contemplated when the act was passed. The state has kept its faith and has not imposed any tax upon any of the exempted property, yet this corporation, on being asked to pay a license fee under a new law applicable to all similar corporations, claims that the words of the exemption shall be extended to prevent the assessment of a small and reasonable license fee under the provisions of this act. Truly, the rule of construction must be reversed in order to extend the exemption beyond the words or the spirit of the act.

The decisions of the courts before cited have demonstrated that neither a tax nor impost has been imposed on any property by the act of 1884, its amendments or supplement.

The state now insists that the terms of the exemption in the charter are not violated by the act of 1884 or its amendments or supplement, but that the real and personal property not actually and in fact in the state, and the stock held or owned by the stockholders, has no additional imposition placed upon it by the legislation referred to.

The exemption was of taxable property not actually and in fact in the state.

If the property was not taxable the exemption is worthless; the phrase is useless.

The real and personal property of the company not actually in fact within the state.

The words "not actually in fact within the state" are used, beyond question, to exclude that portion which is actually and in fact within the state; the territorial property is to remain

taxable. The exemption is to that portion of the property which was taxable by the state and yet not actually and in fact within its territorial limits.

The rule of law was that personal property was taxable at the residence of its owner. *Mobilia sequentur personam.*

This was also provided by statute and was established by the rulings of the courts. *Cooley Tax.* (2d ed.) 56, 372; *Burroughs Tax.,* § 40; cases collected in 25 *Encycl. L.* 133. See *Rev., p.* 1151 (*act of* 1866).

Chief Justice Green, in *State* v. *Branin,* 3 *Zab.* 495, said: "By the second section the legislature declares its intention to tax only property, real and personal, within the state. By the fourth section it is declared that the phrase includes not only all personal estate and property in action within the state, but also chattels owned within this state though without its limits, as steamboats or other vessels afloat as in foreign ports; also, all debts, stocks, property in action of every description belonging to an individual of this state, although the debtor reside or the corporation in which the stock is held be located without the state. One important object of the section is to fix the *situs* or locality of floating property or property in action."

In *Newark City Bank* v. *Assessors,* 1 *Vroom* 22, Chief Justice Whelpley says: "It results from this that the definitions of the term real and personal estate, used in the act of 1851, are part and parcel of the act of 1862, and that stocks of corporations and public stocks, whether within this state or out of it, are taxable."

The *situs* of personal property for taxation is the domicile of the owner. It is regarded as having its *situs* where the owner resides, and it is there by the general rule of law that it is to be taxed. All personal estate within and without the state is taxable to the owner where he resides on the day appointed by law for the assessment.

Chief Justice Green, in *State* v. *Branin,* 3 *Zab.* 496, says: "The general maxim of the law is that personal property of whatever description has no locality, but follows the domicile

of the owner; not that it has no visible locality which cannot be said of a tangible chattel, but that it is subject to the law which governs the person of the owner. *Story Confl. L:,* § 380. But in regard to bonds, stocks and other property these may be said literally to have no *situs* or locality. The law does not operate beyond the jurisdiction of the state; it neither affects the foreign corporation nor the debtor, but simply the property of the creditor who is a citizen of the state and subject to its laws." *Great Barrington* v. *County Commissioners,* 16 *Pick.* 572; *Ang. & A. Corp.* (4th ed.), § 458.

The charter of the Singer Company was passed on February 20th, 1873.

The act of 1851 provided for the taxation of personal property within the state, and in section 4 it provides that the term "personal estate," as used in the act, shall be construed to include goods and chattels of every description, including steamboats and other vessels, money, debts due from solvent debtors, whether on contract, note, bond or mortgage, public stocks and stocks in corporations, whether within or without the state.

The Supreme Court, in 1853, in the case of *State* v. *Rahway,* 4 *Zab.* 56, held that, taking the two sections together, the meaning was that all personal property out of the state was not taxable in the state, but that the expression "steamboats," &c., enumerated in the fourth section after the word "including," taxed those enumerated. The supplement of 1866, to be found in *Nix. Dig., p.* 951, § 4, altered the phraseology and declared that the term "personal estate," as used in the act, should be construed to include goods and chattels of every description, including steamboats and other vessels, money, debts due or owing from solvent debtors, whether on contract, note, bond, mortgage or book account, public stocks and stocks in corporations, whether said personal estate is within or without the state.

The change of phraseology consists in inserting the words "or owing" after "debts due," the words "or book account" after "mortgage," and the words "said personal estate be" before the words "within or without this state."

The intent and effect of this change was to make the expression "within or without the state" refer back to the term "personal estate," and not confine it to steamboats and enumerated property. It was undoubtedly on account of the construction given by the Supreme Court that the act was altered so as to include "all personal estate, whether within or without the state."

Under the act of 1851 the Supreme Court held, in *State* v. *Branin*, 3 *Zab.* 495, that the phraseology included not only all personal chattels and property in action within the state but also chattels owned within the state though without its limits, as steamboats, &c., but, not content with this, the legislature, in 1866, altered the definition of "personal estate" so as to make it include goods and chattels of every description, whether located within or without the state.

On page 3292 of the General Statutes will be found the act of 1866, and section 4 unaltered still reading "whether said personal estate is within or without the state."

On page 3320, however, is an act passed March 16th, 1894, entitled "An act to amend an act entitled 'A further supplement to an act entitled "An act concerning taxes," ' " approved April 14th, 1846, which supplement was approved April 11th, 1866.

This amendment exempts stocks and other personal estate owned by citizens of this state situate and being out of this state upon which taxes shall have been actually assessed and paid within twelve months next, &c.

This makes it evident that from 1866 to 1894 a citizen of this state was taxable on all his personal estate without as well as within the state; and from 1851 to 1866 on such personal estate as was enumerated in the act of 1851.

That the personal property of the company could have been taxed by the state, although not actually and in fact within the state, and was so taxed by the statutes at the time the exemption was granted in 1873, is beyond dispute. That the clause meant personal property whose *situs* was in New Jersey at the residence of the company, although it might not

be actually and in fact in the state, is proved by a comparison of the words of the exemption with the statute and the general rule of law as to the *situs* of personal property.

The opinion of the Court of Errors nevertheless said : " It was well settled and understood that New Jersey could not impose a direct tax upon property of its citizens located beyond its jurisdiction. *McCullough* v. *Maryland, 4 Wheat.* 415. It was not, therefore, to shield the company from direct taxation of its property not actually within the state that this provision of its charter was secured. Immunity to that extent existed without the consent of the state."

That is to say that it was settled law in New Jersey that the personal property of a citizen could not be taxed at his residence unless actually within the territorial limits of the state, and that to this effect was the opinion of Chief Justice Marshall in McCullough *v.* Maryland. Both propositions are unfounded.

The rule of law is the reverse of the propositions claimed, and the case cited does not touch the question.

The assumption in the opinion that the object of the parties was to exempt property which they knew the state could not tax is made the foundation of a strange theory, viz., that the object of the exemption was to protect property from the indirect taxation which might arise from a loss of value of the stock in the hands of the stockholder.

The clause exempts two things, two species of property.

*First.* Real and personal property not actually and in fact in the state.

*Second.* Stock held or owned by any of its stockholders.

The opinion assumes that it only intended to exempt one species—" stock in the hands of the stockholders "—that is, when the act says " real and personal property " and " stock in the hands of the stockholders," it means only to exempt from a direct or indirect tax stock in the hands of the stockholder. This is not construction. It is substituting for the words used other words, depriving the language employed of

all meaning, and the necessary effect of the substitution is a judicial limitation of the legislative power of taxation.

The questions before the court, in McCullough *v.* Maryland, did not involve the *situs* or personal property, nor the right of the state to tax such property actually located outside of its jurisdiction but having its *situs* at the domicile of the owner within the state.

It was purely a governmental question. It was held that the state governments have no right to tax any of the constitutional means employed by the government of the Union to exercise its constitutional powers. Chief Justice Marshall said: "The question is, in truth, a question of supremacy, and if the right of the state to tax the means employed by the general government be conceded, the declaration that the constitution, and the laws made in pursuance thereof, shall be the supreme law of the land, is an empty and unmeaning declaration. The result is a conviction that the states have no power by taxation or otherwise to retard, impede, burden or in any manner control the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. We are unanimously of opinion that the law passed by the legislature of Maryland, imposing a tax on the Bank of the United States, is unconstitutional and void."

The branch Bank of the United States, which the law taxed, had been established in Maryland. It was located within its territorial limits. The only allusion to jurisdiction is the jurisdiction of the person, not of the property. The right of the state to tax the means employed by the general government, when found within its territorial limits, was denied for political reasons. It was impossible that the question of the right to tax extra-territorial property owned by citizens of a state could arise in this case.

Why, then, is this case cited in the opinion to sustain the position that it was well settled and understood in New Jersey that the state could not impose a direct tax upon property of its citizens located beyond its territorial jurisdiction? Such

a position is opposed to the maxim of the law; the universal doctrine of the common law as declared by our courts; the continuous custom of the legislature of the state.

It follows that when the state and the Singer Manufacturing Company used the words "no tax or impost on real or personal property not actually and in fact in the state," they were not engaged, as the opinion of the court assumes, in the useless work of exempting property that was already nontaxable, but had a more reasonable object in view. The property in New York, in Indiana, in Glasgow, in Springfield, and elsewhere, amounting now to $9,000,000, was, by the words used, relieved from taxation in this state; all the property outside was permitted to come in free, and all inside, the result of the manufactory about to be established, was made free from the power of the state to levy any impost on its exportation.

The *certiorari* in the Singer case came on to be heard at the February Term, 1892, before the Supreme Court, consisting of Justices Dixon, Reed and Garrison, and the court held, first, that the tax levied upon miscellaneous corporations, under the act of April 18th, 1884, was a franchise tax imposed as a charge for the privilege of being a corporation or of exercising corporate powers; second, that the tax levied upon the Singer Manufacturing Company was not inconsistent with the terms of its charter, which exempted from taxation the real and personal property of the said corporation not actually, in fact, within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders; third, that whether an exemption of a corporation or its property from taxation will exempt, also, the shares of its stock held by individuals, and whether an exemption of the shares will exempt, also, the corporation and its property, are questions of statutory construction in each case; fourth, that the clause of the charter of the company evinces a legislative intent to relieve from taxation the shares of its stock held or owned by stockholders, but to reserve the right of levying upon the corporation itself any

legal imposition except a tax on its real or personal property outside of New Jersey.

· The opinion delivered by Mr. Justice Dixon is to be found in 25 *Vroom* 441.

The rule of construction universally applied to exemptions from taxation requires that no intendment shall be made in favor of the exemption, but that it must appear, in plain and unmistakable words, to have been the intent of the legislature.

The decision of the case by the Supreme Court on the ground that there was no exemption from the operation of the act contained in the words of the section made it impossible that the language could be clear and unmistakable to the contrary, so that the application of the rule of construction would necessarily result in the affirmance of the opinion of the Supreme Court.

The prosecutor took a writ of error to the Court of Errors and Appeals, from the order of the Supreme Court, that the assessment be affirmed, with costs, and the case was argued in the usual course. The court, however, did not announce any decision of the case until several judges, who had heard the case, were removed from the court by death, and then a re-argument was ordered because there was not a quorum of those who heard the case sitting in the court. The re-argument took place at the November Term, 1895, and the opinion of the Court of Errors was delivered by Mr. Justice Van Syckel. 29 *Vroom* 634. The syllabus of that opinion is as follows:

" 1. A charter which exempts a corporation or its property from taxation, exempts also the shares of its stock held by individuals.

" 2. An express exemption of the shares from taxation, nothing else appearing, will also exempt the company itself from taxation.

" 3. The sixth section of the charter of the Singer Manufacturing Company exempts it from the operation of the act of April 18th, 1884, and the supplement thereto of March 16th, 1891."

The Court of Errors reversed the Supreme Court, on the ground that it had been decided in New Jersey that a charter which exempts a corporation or its property from taxation, exempts also the shares of its stock held by individuals, and by the assumption that the converse of the proposition must be conceded, to wit, that "an express exemption of the shares from taxation, nothing else appearing, will also exempt the company itself from taxation."

The opinion says : " It has long been the accepted law of this state that all enactments which exempt a corporation or its property from taxation exempt also the shares of its stock held by individuals. The converse of this, it seems, must be conceded, so that an express exemption of the shares from taxation will also exempt the company."

If the first proposition be true, I am unable to perceive why the converse must necessarily be true. If it were true that a general exemption of a corporation exempted the stock in the hands of the stockholder, it could only be on the ground that the legislature did not intend double taxation, and that, as the whole had been taxed, it was not probable that the legislature intended to tax any parts of it.

There is no general exemption in the Singer charter. The exemption that is made is "of stock in the hands of the holder," and there is no exemption of stock not in the hands of stockholders nor of any other property of the company within the state.

·The clause of the charter ·expressly recognizes the dual character of the shares in the hands of the shareholders and the property of the corporation itself, and when it exempts that part of the general property outside of the state, it reserves to the state the power to tax the other part not so exempted.

The distinction between the capital stock of the company and the shares into which such stock may be divided and held by individual shareholders is clear and has been fully recognized for years by the Supreme Court of the United States.

Mr. Justice Swain enumerates as objects liable to be taxed other than the capital stock of a corporation, first, the franchise to be a corporation; second, the accumulated earnings; third, profits and dividends; fourth, the real estate belonging to the corporation and necessary for its business.

And Chief Justice Waite, in delivering the opinion of the court in Tennessee *v.* Whitworth, said that "in corporations four elements of taxable value are sometimes found—*first,* the franchise; *second,* the capital stock in the hands of the corporation; *third,* the corporate property, and *fourth,* the shares of capital stock in the hands of the individual stockholders."

Mr. Justice Peckham, in the case of *Bank of Commerce* v. *Tennessee,* 161 *U. S.* 134, decided at the October Term, 1895, said: "The capital stock of a corporation and the shares into which such stock may be divided and held by individual shareholders are two distinct pieces of property. The capital stock and the shares of stock in the hands of the shareholders may both be taxed and it is not double taxation. This statement has been reiterated many times in various decisions by this court and is not now disputed by anyone."

The first proposition to be found in the syllabus of the opinion of the Court of Errors, the assumption of which leads to the conclusion of the court, has been expressly overruled in the Supreme Court of the United States. It is to this effect: "A charter which exempts a corporation or its property from taxation exempts also the shares of the stock held by individuals." *Shelby County* v. *Union Bank,* 161 *U. S.* 153.

The previous cases examined and shown (especially *Farrington* v. *Tennessee,* 95 *U. S.* 679, and *Gordon* v. *Appeal Tax Court,* 3 *How.* 133) not to be inconsistent with the above decision. *Bank of Commerce* v. *Tennessee,* 161 *U. S.* 134, 149; *Van Allen* v. *Assessors,* 3 *Wall.* 573; *People* v. *Commissioners,* 4 *Id.* 244, citing *Farrington* v. *Tennessee,* 95 *U. S.* 687.

The charter of the Bank of Commerce of Tennessee limited the amount of tax on each share of stock in the hands of the stockholder, and the court declared in *Farrington* v. *Tennessee,* 95 *U. S.* 679, that a revenue law of the state which

imposed an additional tax on such shares in the hands of stockholders, impairs the obligation of the contract and is void. Commenting upon it in the subsequent case of Shelby County *v.* Planters' Bank, Mr. Justice Peckham says: "We have found no case in this court which is authority for the proposition that language such as is under consideration in this case, exempts from further taxation both the capital stock of the corporation and the shares of stock in the hands of the individual shareholders. As the Farrington case decides that this language does import that the charter tax is laid upon the shares in the hands of individual shareholders, and that those shares are exempt from further taxation, that question is set at rest, and there being nothing in any case which extends that language to both properties, we hold that when it is made applicable to the separate shares in the hands of individual shareholders, it does not apply to or cover the case of the capital stock of the corporation, and that such stock is liable to be taxed as the state may determine."

Mr. Justice Van Syckel in his opinion says: " It has long been the accepted law of this state that an enactment which exempts a corporation or its property from taxation, exempts also the shares of its stock held by individuals."

The reasoning of the court upon which that conclusion was reached was that as the entire burden of taxes levied upon a corporation ultimately fell upon the shares of stock, it must have been the intention of the legislature in exempting the former to relieve the latter, and cites as the authority for this statement the case of *State* v. *Branin,* 3 *Zab.* 484, and other cases which followed that decision.

The Branin case brought up the construction of an exemption in the charter of the Camden and Amboy Railroad Company. The words of the exemption were, "and thereupon pay the said treasurer of the state at the rate of ten cents for each and every passenger, and the sum of fifteen cents for each and every ton of merchandise transported thereon; and that no other tax or impost shall be levied or assessed upon the said company."

It is, therefore, beyond question that the doctrine which is declared to be settled law in New Jersey is based on a declaration of the Supreme Court of the state, made over forty years ago, against the opinion of the judge who delivered it, and founded on a supposed position taken by the Supreme Court of the United States in reference to a "similar legislative provision." 3 *How.* 133.

Every argument of Chief Justice Green is in favor of sustaining the position taken by the state in the Singer case and the opinion of the Supreme Court in the same case.

It is scarcely necessary to repeat here that the Supreme Court of the United States has, by a continuous line of decisions culminating in the Tennessee tax cases, not only repudiated any such doctrine, but has declared that the reverse of it has been reiterated so many times that it is not now disputed by anyone. "*Cessante ratione legis, cessat ipsa lex.*"

But suppose that Mr. Justice Van Syckel's premise were true, that it is the settled law of New Jersey that the exemption of the property of a corporation exempts also the shares of its stock held by individuals, does it follow that the converse of this must be true? The second clause of the syllabus says: "An express exemption of the shares from taxation, nothing else appearing, will also exempt the company itself from taxation." Or, in other words, that because a general exemption of all the property of a company will be construed to manifest an intention to exempt the stock in the hands of the stockholder, it necessarily follows that the exemption of a part of the property of the company, to wit, the stock in the hands of a stockholder, will exempt all the property of the company. The assumption is that because the whole includes the part, the part must include the whole; because the corporation includes the shareholder, the shareholder must include the corporation. The reasoning is because the greater includes the less, the less must necessarily include the greater.

The Supreme Court of the United States declared that in corporations four elements of taxable value are sometimes found—*first*, the franchise; *second*, the capital stock in the

hands of the corporation ; *third,* the corporate property ; and *fourth,* the shares of capital stock in the hands of individual stockholders.

Now, the reasoning of Mr. Justice Van Syckel is that because an exemption of all the property of the company has been held by the courts in New Jersey to be an exemption of the stock in the hands of individual stockholders, that the court is necessarily bound to declare that all four species of property are included in words which are carefully selected for the purpose of indicating only the last; and that a court which does not yield to this sort of construction is to be considered as resorting to "subterfuge, or narrow and sharp construction, in order to evade the effect of the contract."

When it is remembered that by the well-settled construction of the Miscellaneous Corporation act by the courts of this state, the imposition made by it is held to be not a property tax, but simply a license fee for the privilege of corporate existence ; and when the Supreme Court of the United States declares that this corporate existence or franchise is entirely separate and distinct from the other property of the company and not covered by any exemption accorded to that property, it seems marvelous that the Court of Errors of this state should be made to declare that such a tax is an evasion of the exemption accorded to the shares of stock in the hands of the stockholders.

The decision in the Tennessee tax cases was rendered about the time of the argument of the Singer case, but not reported until some time afterwards.

The attorney-general retained the record in the Court of Errors in the hope that he might be able to take the case up for review, but, as the decision of the state court was against the validity of the acts of the assessing officers acting under the authority of the law, he became satisfied that there was no appellate jurisdiction in the Supreme Court of the United States from a state court in such a case, und the record was subsequently remitted to the court below.

It seems to be definitely settled that under the provisions

of the act of congress of February 5th, 1867, it is essential to the jurisdiction of the Supreme Court, to review a question decided in a state court, that the validity of a statute of, or an authority exercised under any state, be drawn in question, and the decision be in favor of their validity.

"Where the decision of the state court is in favor of the title, right, privilege or immunity claimed under the federal authority, the Supreme Court has no jurisdiction to review it."

III. The amended constitution of 1875 abrogates all prior, special or local laws exempting property from taxation unless they constitute irrepealable contracts.

In the case of *Newark Horse Car Railroad Co.* v. *Clark*, 24 *Vroom* 332, it appeared that it was provided by an act passed in 1865 that as soon as the railroad is finished the president of the said company shall file a statement of the cost, &c., and immediately thereafter the said company shall pay to the treasurer of this state one-half of one per cent. on the cost of the said road, to be paid annually on the first Monday in January, provided that no other tax or impost shall be levied or raised from the said corporation by virtue of any law of this state.

Mr. Justice Van Syckel, delivering the opinion of the court, said: "Under this charter the relator claims to be exempt from assessment for taxation under the general tax laws of the state."

In *Sisters of St. Elizabeth* v. *Chatham*, 22 *Vroom* 89, Mr. Justice Dixon said: "By force of the constitution as amended in 1875, requiring that property shall be assessed for taxation under general laws and by uniform rules, according to its true value, all prior, special or local laws exempting property from taxation were abrogated unless they constitute irrepealable contracts, and that all such subsequent laws are annulled. The judgment of the Supreme Court in this case was reversed upon another ground, but the Chief Justice, in delivering the opinion of the Court of Errors and Appeals, said that the proposition thus announced by Mr. Justice Dixon is wholly indisputable. This settles the claim of immunity against the relator."

The syllabus of the case is as follows:

" 1. The amended constitution of 1875 abrogates all prior, special or local laws exempting property from taxation unless they constitute irrepealable contracts.

" 2. The provision in the charter of the relator does not constitute an irrepealable contract."

IV. The exemption claimed by the company under its charter is not an irrepealable contract with the state limiting the exercise of the taxing power, but the clause is to be construed in connection with the sixth section of the act of February 14th, 1846, which enacted that the charter of every corporation which should thereafter be granted should be subject to alteration, suspension and repeal in the discretion of the legislature.

In *Little* v. *Bowers*, 17 *Vroom* 300: The eighth section of the act under consideration provided that it shall be the duty of the treasurer of the said company, on the first Monday in January in each and every year hereafter, to pay to the treasurer of this state a tax of one-half of one per cent. upon the cost of said road, as shown by the annual report, &c., provided that no other tax or impost shall be levied or assessed upon said company. Mr. Justice Dixon, in delivering the opinion of the court, said: " The act of March 17th, 1854, is a supplement to the charter of the Somerville and Easton Railroad Company, which was granted February 26th, 1847. On February 14th, 1846, the legislature passed a general law concerning corporations (*Pamph. L.*, *p.* 16), the sixth section of which enacted that the charter of every corporation which should thereafter be granted should be subject to alteration, suspension and repeal in the discretion of the legislature. This provision did not bind subsequent legislatures so that they could not grant irrepealable charters, but it created a law which can never justly be put out of sight in determining whether any charter granted was designed to be irrepealable. All acts of the legislature are performed in contemplation of existing laws, and repeals by implication are not favored, and hence this law of 1846 is to be considered as

embodied in every corporate charter thereafter passed unless a purpose to exclude it be plainly perceived."

The words of exemption contained in the Singer charter are in the sixth section, " and if, and so long as the said corporation shall invest, and keep invested in real estate within this state, the sum of five hundred thousand dollars, the real and personal property of the said corporation not actually and in fact within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders, shall not be liable to any tax or impost whatever." This clause, under the decision of the Court of Errors, is to be construed with the act of 1846, and is subject to be repealed or altered at the pleasure of the legislature. It is no contract, but a simple declaration that until altered or repealed this should be the rule of taxation, provided a company, whose whole capital at the time was $1,000,000, and who were authorized, whenever $500,000 should have been paid in, to organize, should invest $500,000 within this state.

The act of the Singer company offered in evidence was approved February 20th, 1873. As all acts of the legislature are performed in contemplation of existing laws, and repeals by implication are not favored, the law of 1846 is to be considered as embodied in the charter, there being no purpose to exclude it plainly manifested. The result is that the rule of construction, as laid down by the Court of Errors, requires this court to hold that the act of 1884, under which this tax was levied, repealed the exemption clause, if, indeed, there was any exemption against the tax imposed by that act. The construction, however, of the two acts together clearly demonstrates that they are in perfect harmony, as no property tax is assessed on the company, but simply a license fee.

For the defendant in error, *Richard V. Lindabury* and *Joseph H. Choate* (of New York).

I. The decision of this court in *Singer Manufacturing Co.* v. *Heppenheimer*, 29 *Vroom* 633, is conclusive upon those questions arising in this case which were litigated and determined in that case.

That the state board of assessors and the state comptroller were and are, in each case, simply the representatives of the state, and that, therefore, the real parties in both cases are the same, will, we suppose, be admitted by everybody.

We have, then, the case of a party to a litigation in which certain issues were distinctly and authoritatively determined against him, seeking, in a subsequent litigation with the same adversary, to retry those issues. This, we submit, cannot be done. *Cromwell* v. *County of Sac*, 94 *U. S.* 351; *Bank of Commerce* v. *Tennessee*, 161 *Id.* 134.

II. Even if the former adjudication be not regarded as conclusive, the court ought to follow it under the doctrine of *stare decisis.*

The only question raised on this writ of error, as we understand it, is whether or not the charter of the Singer company contains an irrepealable contract with the state exempting it from the imposition of a franchise or license tax.

That was the question, and the only question, considered or decided in the former case. Upon its consideration the court had the benefit of a very able opinion delivered in the court below, in which, as was admitted on the argument here, and must again be admitted, everything that could be said in favor of the tax was said and well said. It also had the benefit of two successive oral arguments, in both of which the learned attorney-general participated. The case was submitted at the November Term, 1893, and was not decided until June 15th, 1896. The decision was then unanimous.

We submit that a judicial conclusion, arrived at after argument and re-argument, and consideration and reconsideration, and then concurred in by eleven separate judges and dissented from by none, ought to be followed and not disregarded except for the weightiest reasons.

In 1 *Bl. Com.* 69 it is said: "It is an established rule to abide by former precedents where the same points come again in litigation, as well to keep the scale of justice even and steady and not liable to waver with every new judge's opinion, as also because the law in that case, being solemnly de-

clared and determined what before was uncertain and perhaps indifferent, is now become a permanent rule which it is not in the breast of any subsequent judge to alter or vary from according to his private sentiments, he being sworn to determine not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one." See, also, 1 *Kent Com.* 476; *Bates* v. *Relyea,* 23 *Wend.* 340; *Oakley* v. *Aspinwall,* 13 *N. Y.* 500; *Lahr* v. *Metropolitan Elevated Railway Co.,* 104 *Id.* 268 (1887); *State* v. *Silvers et al.,* 47 *N. W. Rep.* 772 (1892).

What reasons of the commanding force required by these authorities are given for asking this court to disregard its former decision? None of which we have ever heard. The only reason ever suggested is that since the former decision the Supreme Court of the United States has held that a charter contract exempting from taxation the stock of a Tennessee corporation in the hands of its stockholders does not exempt the corporation itself. *Shelby County* v. *Union and Planters' Bank,* 161 *U. S.* 149.

Surely this decision furnishes no ground for asking this court to depart from its former judgment.

(a) It is not of binding force here and contains no argument different from or in addition to those which have found expression in the books for the last fifty years, and were undoubtedly considered by this court on its former adjudication.

(b) The Supreme Court of the United States, in the *Bank of Commerce Case,* 161 *U. S.* 134, held itself bound by its former decision in the Farrington case as to all points actually decided in that case.

(c) This court did not rest its former decision upon the ground that by exempting the stock of the Singer company in the hands of its stockholders the legislature had exempted the corporation also, but on the combined effect of the clause exempting the stock and the clause exempting the property, real and personal, outside the state. It held that the two clauses, taken together and construed in the light of the cir-

cumstances surrounding the grant of the charter, showed a purpose to exempt the company and its stockholders from all taxes except such as might be levied upon its tangible property within the state.

(d) When the Singer company's charter was passed, the rule was thoroughly established in this state that the exemption of a corporation from taxation exempts its stockholders, and that the exemption of its stockholders exempts the corporation. *State* v. *Gardiner,* 1 *Zab.* 557 ; *State* v. *Berry,* 2 *Harr.* 80 ; *State* v. *Branin,* 3 *Zab.* 484, 493 ; *State* v. *Bentley, Id.* 532, 538 ; *Camden and Amboy Railroad Co.* v. *Hillegas,* 3 *Harr.* 11 ; *State* v. *Powers,* 4 *Zab.* 400 ; *State Board of Assessors* v. *Morris and Essex Railroad Co.,* 20 *Vroom* 193, 216. The clause in question must, therefore, be read in the light of these adjudications, and thus reading it, no one can doubt, it seems to us, that by exempting the stock the legislature intended to exempt the corporation also.

This view renders of small account the conclusion of the Supreme Court of the United States as to what other parties intended by the use of similar language in another state, under other circumstances, over sixty years ago.

III. The tax in question is inconsistent with the exemption granted to the Singer company by the sixth section of its charter.

The charter amounted to an invitation from the state to the Singer company to remove its vast business from New York to New Jersey. Its language, read in the light of the proven facts, admits of no other interpretation. What the legislature offered the company as it would ordinarily be understood by the common mind, was this : that if the company would invest $500,000 in real estate in the State of New Jersey for the purposes declared in the first section of its charter, and would keep the same so invested, it should not be liable at any time to any tax or impost except upon its real and personal property within this state.

The language used to express this offer is the following :

" The real and personal property of the said corporation,

not actually and in fact within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders shall not be liable to any tax or impost whatsoever."

Is it not self-evident that the legislature intended by this comprehensive language to offer a guarantee against all taxation or imposition of any kind whatsoever except upon the real and personal property of the company within the state? And is it conceivable that the company in accepting the offer understood it in any other way? If the legislature reserved the power to impose a license fee upon the company at will for an unlimited amount, what does the charter guarantee against any imposition whatever upon its stock and its property without the state amount to? Is it then anything less than a delusion and a snare? And are we to impute to the legislature an intent to trick the Singer company, or is it to be supposed that the Singer company gravely exacted and the legislature as gravely granted a mere empty and meaningless exemption?

It was well said by the Supreme Court of the United States in *Gordon* v. *Tax Appeal Court,* 3 *How.* 133, that the faith of the state is never pledged except for some substantial, some effectual purpose.

Could that purpose in this case have possibly been anything less than the exemption claimed, and still be either substantial or effectual? And, if not, is such purpose to be read out of this act by the court in obedience to a supposed rule of construction that requires the court to find a meaning in favor of the state that it would not find if the state were an individual?

We submit that it is not. That while the courts may properly resolve all doubts in favor of the state on the question of whether or not it has made a contract, yet when that fact is ascertained the contract so found should be construed in the same way as every other contract, namely, according to the intention of the parties. *Home of the Friendless* v. *Rousse,* 8 *Wall.* 430, 437; *Tennessee* v. *Whitworth,* 117 *U. S.* 129, 137.

A different rule would make contracts between an individual and the state impossible. *New Haven* v. *City Bank*, 31 *Conn.* 106; *Grand Gulf Railroad Co.* v. *Buck*, 53 *Miss.* 246; *Hannibal, &c., Railroad Co.* v. *Shacklett*, 30 *Mo.* 550; *Scotland Co.* v. *Missouri, &c., Railroad Co.*, 65 *Id.* 134; *Mayor, &c., of Baltimore* v. *Baltimore and Ohio Railroad Co.*, 6 *Gill* 288; *Gordon* v. *Appeal Tax Court*, 3 *How.* 133; *Wilmington Railroad Co.* v. *Reid*, 13 *Wall.* 264; *State* v. *Branin*, 3 *Zab.* 484, 493; *State* v. *Bentley, Id.* 532, 538; *State* v. *Powers*, 4 *Id.* 400; *State* v. *Berry*, 2 *Harr.* 80; *Camden and Amboy Railroad Co.* v. *Hillegas et al.*, 3 *Id.* 11; *State Board of Assessors* v. *Morris and Essex Railroad Co.*, 20 *Vroom* 193, 216; *Worth* v. *Petersburg Railroad Co.*, 89 *N. C.* 301; *Union Bank of Tennessee* v. *State*, 9 *Yerg.* 490; *Iron City Bank* v. *City of Pittsburg*, 37 *Pa. St.* 340, 343.

The tax in question is sought to be sustained in harmony with the sixth section of the Singer company's charter by the following arguments:

*First.* It is contended that it is not a tax at all, but a mere license fee exacted from the company for the privilege of its continued existence.

But if it be a mere license fee it is still an annual exaction imposed for the purposes of public revenue. Such exactions have always been held to be taxes by whatever name they happen to be called. *Western Union Telegraph Co.* v. *Massachusetts*, 125 *U. S.* 530, 547; *Illinois Central Railroad Co.* v. *Decatur*, 147 *Id.* 190, 199; *Paterson* v. *Society for Useful Manufactures*, 4 *Zab.* 385, 400; see, especially, *Tennessee* v. *Union and Planters' Bank, supra; Worth* v. *Petersburg Railroad Co., supra.*

Again, the charter protects the company not only against taxes so called but also against any impost whatsoever.

"Impost" is defined in *Anderson's Law Dictionary* as follows: "A duty on imported goods and merchandise. In a larger sense, any tax or imposition. It comprehends every species of tax or contribution not included under the ordinary terms 'taxes and excises.'" This definition is quoted from the

opinion of Mr. Justice Swayne in *Pacific Insurance Co.* v. *Soule,* 7 *Wall.* 445.

If a license fee is not a tax it surely is an impost, and as such is contrary not only to the spirit but also to the very letter of the company's charter. This argument therefore fails.

*Second.* It is contended that, by the terms of the charter, the company is only exempted from direct taxation upon its capital stock and its property, real and personal, without the state. This is the view which found favor with the Supreme Court on the hearing of the former case. We have already shown that it is contrary to the spirit and reason of the exemption clause, and if adopted would render that clause "purely illusory." We submit that it is none the less contrary to the plain reading of the exemption clause. That clause exempts not only the stock of the company, which might be the subject of a direct tax, but also its property, real and personal, without the state, which can never be the subject of such a tax. No state can tax the property of its citizens located beyond its jurisdiction. Chief Justice Marshall, in *McCullough* v. *Maryland,* 4 *Wheat.* 415, 429; *Delaware Railroad Tax,* 18 *Wall.* 206, 229; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 *U. S.* 196.

The only way that such property can be taxed in the case of a corporation is by a direct tax upon the corporation itself of the character claimed for the one in question in this suit. To give any effect whatever, therefore, to the letter of exemption clause on the subject of foreign property we must of necessity reject this tax.

The argument put forth in support of the last-named contention, viz., that if the legislature had intended to exempt the company it would simply have exempted the stock, is manifestly unsound. The legislature intended that the company should pay tax upon its property within the state. Its requirement that the company shall keep $500,000 invested in real estate here shows this. If it had exempted the stock simply the result would have been to defeat this purpose and

exempt everything. By exempting the stock and property outside the state it avoided this effect and yet made its purpose clear.

IV. The sixth section of the Singer company's charter constitutes an irrepealable contract with the state.

(a) It constitutes a contract.

It contains all the elements of a contract. There are parties, a subject-matter and a consideration moving from both sides. On the one side is a promise by the legislature to the company that if it will remove a portion of its business to the State of New Jersey, and will invest $500,000 in real estate here, for the purpose of its business, and will keep that amount so invested, it may enlarge its business as much as it chooses, and may carry on as large a portion of the same out of the state as it shall find convenient, without being liable at any time to a tax upon its capital stock or any of its property not actually within the state.

On the other side is an acceptance of this promise, and a complete performance of the condition imposed with all the incidental benefits conferred thereby upon the state.

Such charters, when accepted, have been held to constitute contracts in a multitude of cases. *State* v. *Perry*, 2 *Harr.* 80; *Camden and Amboy Railroad Co.* v. *Hillegas*, 3 *Id.* 11; *State* v. *Gardner*, 1 *Zab.* 557; *State* v. *Hancock*, 5 *Vroom* 537, 538; *Bridge Co.* v. *Hoboken Land and Improvement Co.*, 2 *Beas.* 86; *Mount Pleasant Cemetery Co.* v. *Newark*, 23 *Vroom* 539; *Home of the Friendless* v. *Rouse*, 8 *Wall.* 437.

(b) The contract is irrepealable.

If the charter had been granted prior to the passage of the Corporation act of February 4th, 1846, probably no one would deny this proposition.

The act of 1846 contains the following section:

"6. The charter of every corporation which shall hereafter be granted by or created under any of the acts of the legislature, shall be subject to alteration, suspension and repeal, in the discretion of the legislature."

It will doubtless be urged that this section is to be read. into the Singer company's charter, and that it renders the same repealable at the discretion of the legislature.

For a long time after the passage of the act of 1846 it was uniformly held in the courts of this state that the sixth section of that act was to be literally read into every charter thereafter granted by the legislature. The last case so holding was *Morris and Essex Railroad Co.* v. *Commissioners of Taxation*, 8 *Vroom* 228, 237; 9 *Id.* 472.

This case was removed to the Supreme Court of the United States and the decision rendered in New Jersey reversed. *New Jersey* v. *Yard*, 95 *U. S.* 104.

The federal court, in reversing it, declared that a legislature could not bind its successors; that, notwithstanding the act of 1846, it was still competent for any legislature to make an irrepealable contract if it chose, and that it was therefore a question in every case of a contract made by the legislature, whether that body intended that the right to change or repeal it should inhere in it, or whether, like other contracts, it was perfect, and not within the power of the legislature to impair its obligations.

The court held the contract under consideration in that case to be irrepealable because it said it could not be believed that it was the intent of either party to it that one should be held forever, and the other only for a day. And it refused to read the act of 1846 into the contract because the contract was inconsistent with it.

To the same effect is *State Board of Assessors* v. *Morris and Essex Railroad Co.*, 20 *Vroom* 193, 218.

Under the law as thus settled the only question that can arise in this case touching the act of 1846 is whether or not the legislature can be held to have intended that it should become a part of the Singer company's charter.

It seems to us that the contrary intent is too clear for debate. The declaration is that "if and so long as the said company shall invest and keep invested," &c., its property.

and stock, &c., "shall not be liable to any tax or impost whatsoever."

This language is so utterly inconsistent with the sixth section of the act of 1846 that they cannot possibly stand together.

A clause in the charter granting immunity dependent upon the discretion of succeeding legislatures, would utterly destroy the clause granting it so long as the company performs its part of the contract, and so the grant of immunity for so long a time as the company performs its contract can have no meaning except one utterly repellant to the sixth section of the act of 1846.

Again, it might well be asked, in the language of Mr. Justice Miller in the Yard case, can it be believed that it was intended by the parties to be a part of this contract that the State of New Jersey was, at her option, to be bound or not? Or, it might be asked, not only upon the question of the irrepealability of the contract but of its construction as well, can it be believed that it was within the contemplation of either of the parties that when the Singer company had increased its capital to $10,000,000 and was employing $9,000,000 of that capital outside the state according to the express permission of its charter, that it should be liable to taxation on the whole of that $9,000,000 in the mere discretion of any legislature that should happen to be returned?

Is it not manifest that it was to guard against this very liability that the contract was made? The business the company was doing at the time the charter was granted and the words of the charter itself show that the present development of the company's business and the employment of a large part of its capital outside the state was at that time within the contemplation of both parties. What was more natural, therefore, than that the company should exact as a condition of its coming here, and that the legislature should grant as an inducement to it to come, absolute immunity for all time to come from any taxation except upon its property within the protection of the state?

Again, it might be asked, why, if the legislature did not mean to bind itself as by a contract, and that to something substantial, did it require the Singer company to invest and keep invested $500,000 in real estate in New Jersey? Can it be that no counter-obligation was intended to be made dependent upon the performance of this one? And if there was one, what was it if not an obligation to abstain from taxation?

Manufacturing companies have always been favorites with the legislature of this state. It has been the policy of the state from the earliest times to encourage and not to suppress them. Never, until the act of 1891, has an attempt been made to tax their franchises. They, together with mining corporations, were expressly excepted from the act of 1884 taxing the franchises of all other corporations.

It is therefore attributing to the legislature of 1873 no uncommon or improbable design to claim that it intended to secure the Singer Manufacturing Company of this state by a pledge of exemption from all taxation except upon its property within the protection of the state.

We submit that the contract in the charter of the Singer company is irrepealable.

V. Even if the sixth section of the company's charter is repealable, it was not repealed by the supplement of 1892, under which said tax was levied.

It will not be argued that the repeal of said section is directly affected by this act. It can only be insisted at most that it arises by implication. There is, however, no general repealing clause in the act, and there are no words from which an intent to repeal can be inferred unless it be the words "all other corporations." These words, however, are substantially like the ones contained in the acts under consideration in *State* v. *Minton*, 3 *Zab.* 529, and *Vail* v. *Easton and Amboy Railroad Co.*, 15 *Vroom* 237, and in both these cases they were held not to be sufficient to indicate an intent to repeal the private charters with which they were supposed to be in conflict.

In *State* v. *Commissioners of Railroad Taxation,* 9 *Vroom* 472, the doctrine of State *v.* Minton was expressly approved by the Court of Errors and Appeals. Mr. Justice Van Syckel there said : " The well-settled law in this state is that the provisions of a special charter shall not be altered or repealed except by express words." See, also, *Catholic Protectory* v. *Kearney,* 27 *Vroom* 385.

There is no constitutional provision requiring either generality or uniformity in laws taxing corporate franchises (*Standard Underground Cable Co.* v. *Attorney-General,* 1 *Dick. Ch. Rep.* 270), and therefore the ancient and well-settled doctrine of these cases has full applicability to the case in hand.

We submit that it is decisive of this question.

But it may be urged in reply that if the exemption clause in the Singer company's charter was not repealed by the act of 1891, it was at least by the provision of the constitution of 1874 on the subject of taxation hereinbefore set out. It was, indeed, held in *Sisters of St. Elizabeth* v. *Chatham,* 22 *Vroom* 89 ; *S. C.,* 23 *Id.* 373, that the effect of this clause of the constitution was of itself, *proprio vigore,* to abrogate all prior or special laws exempting property from taxation.

But to any such contention it seems to us there are two sufficient answers :

*First.* That the constitution has only to do with property taxation, so called, and therefore does not repeal special exemptions, so far as they protect from franchise or license taxes. *Standard Underground Cable Co.* v. *Attorney-General, supra.*

*Second.* That if the Singer company's contract is repealable by the legislature, under the act of 1846, that is the only way in which it can be repealed, and that its repeal cannot be accomplished by constitutional amendment. The case of *Mount Pleasant Cemetery Co.* v. *Newark, supra,* is again in point. It was there held that although the board of chosen freeholders of the county of Essex had power to repeal the tax exemption clause in the prosecuting company's charter, a like power was not possessed by the legislature. The reason

was that the charter had reserved it to one and not to the other.

VI. If the sixth section of the Singer company's charter constitutes an irrepealable contract, the tax in question is void, for the further reason that the legislature cannot impose a license fee for the exercise of a franchise which it has already granted without the power of revocation.

If we have an irrepealable contract on the subject of taxation, that contract, we submit, protects the franchise as well. Argument can scarcely be needed to prove that if the legislature cannot repeal the sixth section directly, it cannot do it indirectly by repealing the charter. When the parties contracted for tax exemption for a certain time, by necessary implication they must have contracted for a franchise for the same time, and the irrepealability of the one carries with it the irrepealability of the other. *Cooley Const. Lim.* (6th ed.) 334; *Gordon* v. *Appeal Tax Court,* 3 *How.* 133; *Montclair* v. *New York and Greenwood Lake Railroad Co.,* 18 *Stew. Eq.* 436, 443; *Miller* v. *State,* 15 *Wall.* 478, 488.

The question, therefore, of the irrepealability of the charter resolves itself into a question of legislative intent under the doctrine of the Yard case.

If the legislature intended an irrepealable contract on the subject of taxation, to last so long as the Singer company should keep $500,000 invested in real estate in New Jersey, is it conceivable that it did not also intend an irrepealable charter for the same period? Every argument in favor of the one intendment seems to be equally strong in favor of the other. A contract on the subject of taxation would be valueless and delusive if it did not carry with it a contract for a franchise.

A grant is ordinarily held to include all that is necessary to its enjoyment, and a contract will include not only the things expressed but all others which by reason of the subject-matter are necessarily implied.

We submit that it would be an imputation upon the legislature to hold that in granting an irrepealable contract for

which it exacted a large consideration it intended to reserve the power to destroy such contract at will.

The charter of the company being thus irrepealable, how can the legislature impose a license tax upon the company for its right to exist? See *Jersey City Gas Light Co.* v. *United Gas Improvement Co.*, 46 *Fed. Rep.* 266.

In *Honduras Co.* v. *Board of Assessors*, 25 *Vroom* 278, 282, and in *Lumberville Delaware Bridge Co.* v. *State Board of Assessors*, 26 *Id.* 529, similar taxes levied under the act of 1884 were justified on the express ground that they were imposed for the privilege of exercising franchises repealable at the will of the legislature.

In *Horn Silver Mining Co.* v. *New York*, 143 *U. S.* 305, 314, a license fee imposed upon a foreign corporation for the privilege of doing business in the State of New York, was upheld on the ground that the state had the right to exclude such corporations entirely or to admit them upon such terms as it deemed expedient.

In every case in which a license fee has been upheld, so far as we have been able to discover, the privilege licensed was revocable at the will of the legislature.

On the other hand, license taxes were set aside in *Norfolk and Western Railroad Co.* v. *Pennsylvania*, 136 *U. S.* 114, and in *Leloup* v. *Port of Mobile*, 127 *Id.* 640, because they were levied on foreign corporations engaged exclusively in interstate commerce, the court holding that the privilege of carrying on such a business was derived from the national government, not from that of the state, and was therefore beyond the control of the state. See, also, *California and Pacific Railroad Co.*, 127 *Id.* 1, 40.

We submit that the tax in question is both illegal and unconstitutional, and should be set aside.

The opinion of the court was delivered by

VAN SYCKEL, J.   This controversy relates to the imposition of an assessment, amounting to the sum of $4,209.30, levied by the state board of assessors, for the year 1897, upon

the Singer Manufacturing Company, under the Corporation Tax act of 1884 as amended in 1892. *Gen. Stat., p.* 3336, § 260.

It is called a franchise tax, and is laid upon the entire capital of the company less $814,000, the assessed value of its real and personal property in this state.

The defendant company is a manufacturing corporation, chartered by special act of the legislature of this state, in 1873 (*Pamph. L., p.* 971), with a capital stock of $10,000,000.

The exemption of the company from liability to this tax rests upon the provisions contained in the sixth section of its charter, which reads as follows:

"That whenever five hundred thousand dollars shall have been paid in, said corporation may organize and proceed to business under this act, and shall immediately thereafter file with the secretary of state of this state a certificate of such payment and organization, whereupon and not until then shall this act take effect; and if and so long as the said corporation shall invest and keep invested in real estate within this state the sum of five hundred thousand dollars, the real and personal property of the said corporation not actually in fact within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders shall not be liable to any tax or impost whatsoever."

Previous to its incorporation in this state, the company was incorporated under the laws of the State of New York, where it had a large factory. It also had a factory in Glasgow, Scotland, one in Austria, and another in the State of Indiana.

Upon the grant of its charter by this state, the New York factory was abandoned, and the business removed to Elizabeth, New Jersey, where a large factory was erected, giving employment to over four thousand men.

The property of the company invested in manufacturing in this state, more than one-half of which is real estate, exceeds in value $1,000,000.

The question to be solved is whether the sixth section of the charter of this company constitutes an irrepealable con-

tract with the state, and if it does, whether the imposition of this tax violates the contract.

The sixth section contains all the elements of a contract. There are present a subject-matter, parties and a consideration. On the one side is a complete performance, and on the other acceptance.

That it must be regarded as a contract under our adjudications there can be no question. *State* v. *Branin,* 3 *Zab.* 484; *State* v. *Berry,* 2 *Harr.* 80; *Camden and Amboy Railroad Co.* v. *Hillegas,* 3 *Id.* 11; *Bridge Co.* v. *Hoboken Land and Improvement Co.,* 2 *Beas.* 81; *Mount Pleasant Cemetery Co.* v. *Newark,* 23 *Vroom* 539.

The stringency with which this rule is applied is illustrated in the opinion of the late Chief Justice in the case last cited.

Is this contract irrepealable?

If the sixth section of the charter of the company contains the entire contract, it is unassailable by state legislation. Both the federal and state constitutions inhibit the passage of any law by the state impairing the obligation of a contract.

The state attempts to justify this tax by reading into the charter of the Singer company the sixth section of the act of 1846 (*Pamph. L., p.* 16), which is as follows:

"The charter of every corporation which shall hereafter be granted by or created under any of the acts of the legislature shall be subject to alteration, suspension and repeal in the discretion of the legislature."

For many years after the passage of this act it was uniformly held by the courts of this state that the sixth section of the act of 1846 was to be literally read into every charter thereafter granted by the legislature, thereby rendering every such charter subject to repeal or alteration at legislative discretion. Such was the judgment of this court in *Morris and Essex Railroad Co.* v. *Commissioners of Railroad Taxation,* 9 *Vroom* 472, decided in 1875. That case was removed to the Supreme Court of the United States and the decision of this court was reversed. *New Jersey* v. *Yard,* 95 *U. S.* 104. The federal court, in reversing, declared that a legislature

could not bind its successors; that, notwithstanding the act of 1846, it was still competent for any legislature to make an irrepealable contract if it elected to do so, and that it was therefore a question in every case of a contract made by the legislature, whether that body intended that the right to change or repeal it should inhere in it, or whether, like other contracts, it was perfect and without the power of the legislature to impair its obligation.

The federal court held the contract under consideration in that case to be irrepealable because it could not be believed that it was the intent of either party to it that one should be held forever and the other merely at will, and it refused to read the act of 1846 into the contract because the contract was inconsistent with it.

The rule thus so explicitly laid down by the federal court has since been accepted as the law of this court. *State Board* v. *Morris and Essex Railroad Co.*, 20 *Vroom* 193. Unless, therefore, an intention can fairly be drawn from the terms of this contract, as agreed upon by the parties, to reserve to the state the right to repeal the contract at will without the consent of the company, there can be no departure from it.

There is nothing in the language of this contract which gives the slightest foundation for the suggestion that the state reserved the right to deprive the company at will of the benefit it was to receive under the agreement after it had fully performed on its part.

The undertaking is express that, if and so long as the company shall invest and keep invested $500,000 in real estate in this state, the exemption shall continue. There is no uncertainty in that respect. It excludes most clearly the idea that the act of 1846 was to be deemed a part of the Singer charter.

It cannot be conceived that either the state or the company deliberately entered into a contract by which it was understood and intended that the state should be at liberty to deprive the company of the benefit to be derived from it as soon as the company had performed on its part. Such a

proposition could not have been seriously made by the state nor for a moment entertained by the company.

The terms of the contract and the circumstances attending it repel the assumption that the entire engagement is not expressed in the sixth section of the charter.

When a contract is made the good faith of the state must be preserved and the contract performed according to a reasonable and just interpretation of it.

The company was induced to remove its works from the State of New York and to erect a large and expensive factory in this state by this agreement to limit the power of the state to subject it to taxation, and it will be derogatory to the state to resort to any subterfuge or narrow and sharp construction in order to evade the effect of the contract.

It may be well to observe here that it could not have been supposed by those who voted for the constitutional amendments of 1875, that it was intended to bestow upon the legislative branch of the state government the power to disregard and violate the contracts into which the state had previously entered. It would be a reflection upon the integrity of those who framed the amendments, to infer such a power from any language contained in them. That no such power resides in the lawmaking power by force of the constitutional amendments of 1875 was manifestly the opinion of this court in *Mount Pleasant Cemetery Co.* v. *Newark,* 23 *Vroom* 539. So free from doubt was this question regarded that the distinguished Chief Justice who delivered the opinion of the court in that case did not even suggest that it was a question worthy to be considered.

The contract must be regarded as irrepealable. The real question in the cause is, what is its true meaning and its just construction?

The exemption is " that the real and personal property of the company not actually and in fact within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders, shall not be liable to any tax or impost whatsoever."

It has been the accepted law of this state since 1852 that an enactment which exempts a corporation or its property from taxation also exempts the shares of its stock held by its stockholders. *State* v. *Branin,* 3 *Zab.* 484; *State* v. *Bentley, Id.* 532; *State* v. *Powers,* 4 *Id.* 400.

In the case last cited Chief Justice Green declared that this principle must be considered as clearly settled. It was the conceded law of the state at the time the contract with the Singer company was concluded, and has not been challenged until the present controversy arose.

It had the sanction of the federal courts and was pronounced to be the law by the highest legal tribunals in many of the states. *Gordon* v. *Appeal Tax Court,* 3 *How.* 133; *Farrington* v. *Tennessee,* 95 *U. S.* 679; *Bank* v. *Tennessee,* 104 *Id.* 493.

Conceding this to be the law, it must logically result that an express exemption of the shares of a corporation from taxation will also exempt the company, unless it can be maintained that a burden cast upon the company is not a burden upon the shares of the company which represent its property.

In the case cited from 3 *How.* 133, upon which Chief Justice Green based his decision in the Branin case, the legislature had extended the charters of certain Maryland banks, upon their having subscribed for the stock of a turnpike company, and in the act of extension had pledged the faith of the state not to impose any further tax or burden upon them during the continuance of their charters. This was held to protect the stockholders against a tax upon the stock of the banks in their hands.

The court said : "Does the contract exempt the respective capital stocks of the banks, as an aggregate, and the stockholders from being taxed as persons on account of their stock? We think it does both. The aggregate could not be taxed without its having the same effect upon the parts that a tax upon the parts would have upon the whole."

That is a self-evident proposition, and it is equally clear that no sane person would regard as of any value an exemp-

tion of the shares of a corporation, if the state was left free to impose taxation at its will upon the corporation itself.

In either case the tax is in fact exacted from the stockholders; they are the company.

In *Mayor of Baltimore* v. *Baltimore and Ohio Railroad Co.*, 6 *Gill* 288, the charter of the company provided that the shares of capital stock of the company should be personal property and exempt from the imposition of any tax or burden. This was held to exempt the company as well as the stock from taxation.

The court said : " The design contemplated by the legislature in the insertion of this clause of exemption in the act of assembly was to confer a certain substantial, not a nominal, benefit on the stockholders and to induce capitalists to risk their money in a novel and hazardous enterprise. To impute to the legislature, in the case before us, an intention to exempt the shares of the stock from taxation and at the same time to reserve the right to tax everything which constituted it a stock and gave to it its value, would be gratuitously to cast an imputation upon the legislature inconsistent with every principle of judicial courtesy."

This is precisely what this court has been urged to do in this case.

In like cases of exemption of shares in the hands of stockholders in other states the courts have been equally pronounced in declaring that if the company itself was held to be subject to taxation, the contract would be " a piece of folly and the promised exemption a delusion." *Scotland Co.* v. *Missouri Railway Co.*, 65 *Mo.* 123 ; *Grand Gulf Railroad Co.* v. *Buck*, 53 *Miss.* 246 ; *Hannibal Railroad Co.* v. *Shacklett*, 30 *Mo.* 550 ; *New Haven* v. *City Bank*, 31 *Conn.* 106.

The exemption granted to the Singer company is far broader than that in any case to which the attention of the court has been directed.

There is not only an express exemption of the stock of the corporation in the hands of stockholders, but there is an express limitation upon the right to tax the company itself,

by which the extent of the state's right is defined. "The real and personal property of the company not actually in fact within the state is not liable to any tax or impost whatsoever."

This contract was made long after the decisions before cited from 3 *Vroom*, and long before the decision of Justice Peckham in 161 *U. S.*, in which he expressed himself as unwilling to adopt the previously-declared construction of Justice Swayne, that an exemption of the shares exempted the company.

The language of the contract was fitly chosen to exclude any claim that the company was to be wholly exempt from taxation. The provision that the real and personal property of the company not actually in fact within the state shall be exempt implies the reservation of a right to tax the real and personal property which is within the state. The apparent purpose and entire effect of the language used is to enable the state to tax property within its borders. The statute was drawn to secure to the state the benefit of taxing the property which the company, for the grant of its franchises, agreed to hold within the state. Such property, real and personal, must, under our constitutional provision, be assessed for taxes like other real and personal property, and not otherwise.

More comprehensive language to assure absolute immunity from the burden now sought to be laid upon it could not be employed.

The state pledged exemption not from taxation only, but from any imposition whatsoever.

Much of the brief on the part of the state is devoted to proving that, at the time the Singer charter was granted, the accepted meaning of the word "impost" was "a tax or tribute or levy upon goods brought from out of the state or country into it," and the familiar rule was invoked that after a practical construction has been given to language by judicial decision, it will be presumed that it has been adopted with the meaning so given to it.

If this meaning is given to "impost," the charter must be read as follows:

"So long as $500,000 shall be invested in real estate within this state, the real and personal property of the corporation not actually in fact within the state, and the stock of said corporation held or owned by any of its stockholders, shall not be liable to any tax or duty upon any property which it shall bring from out of this state into the state."

It is apparent that such an interpretation of this language is in contravention of the expressed intention of the parties to the contract. Property out of the state is to be non-taxable, but as soon as it is brought into the state it is made subject to imposition in language in respect to which there is no uncertainty.

This narrow and restricted meaning given to the word "impost" would lead to an absurd result and is manifestly inadmissible.

In *Pacific Insurance Co.* v. *Soule*, 7 *Wall.* 433, Mr. Justice Swayne says: "Impost is a duty on imported goods and merchandise. In a larger sense, it is any tax or imposition." And again, "that duties and imposts were probably intended to comprehend every species of tax or contribution not included under the ordinary terms, taxes and excises."

We are confirmed in our view expressed in 29 *Vroom* that the word "impost," as used in the Singer charter, includes every kind of enforced contribution to the public treasury.

What the corporators evidently apprehended, and what the charter in express words guards against, is the laying of an imposition of any nature upon the shares of capital stock as well as upon the real and personal property of the company outside of this state.

The charter couples real and personal estate in the exempting clause, and while the *situs* of personal property for taxation is the domicile of the owner, the idea of imposing in this state a direct tax upon the real estate of the Singer company lying in Scotland, in Austria and in other places outside of this state, has never been suggested in the wildest scheme for

raising public revenue, and it surely did not enter into the consideration of the parties in this contract for immunity from taxation.

It is not conceivable that either the state or the company supposed that this charter simply gave the company a pledge that its property, real and personal, outside of the state should not be subject to direct tax, reserving to the state unlimited power to tax the capital of the company and thereby tax that property by indirection.

The manifest object was to restrain the state from levying an indirect imposition upon the property of the company outside the state in the mode now resorted to or in any other way. The language is most aptly chosen to protect the company.

The imposition resisted by the company in this case is laid upon the entire capital stock of the company of $10,000,000, less the value of its real and personal property in this state, and is in effect as much an impost on property out of this state as if it was put directly upon the property itself and not upon the capital which stands for and represents it. It is an attempt to accomplish by indirection what it is stipulated shall not be done. It is an effort to levy a franchise tax out of the many millions of dollars of its capital invested by the company in real and personal property outside of this state.

The act of 1884 (*Pamph. L., p.* 232) is entitled "An act to provide for the imposition of state taxes upon certain corporations and for the collection thereof."

In that act this imposition is called a yearly license fee or tax.

In a supplement passed to the act of 1884 (*Pamph. L.* 1891, *p.* 150) it is styled "a tax."

In a further supplement passed in 1892 (*Pamph. L., p.* 136) it is called "an annual license fee or franchise tax."

It is wholly immaterial what name may be given to it. The fact that it is called a "license fee" or "franchise tax" cannot validate it. It is levied under an act passed "to authorize the imposition of state taxes," and it is none the

less an interdicted imposition, and none the less a tax because it is given a new name.

Although under our adjudications it is not a tax on property in a sense which brings it within article 4, section 7, paragraph 12 of our state constitution, it is a tax on the capital stock of the corporation. Otherwise the act would be manifestly void for want of a title expressing its object, and the state would be deprived of all its revenue under the act of 1892. The franchise of the company is the right to hold property and exercise its corporate privileges. The Supreme Court of the United States has decided that where a corporation is exempted from taxation, it is not subject to a tax on its franchise. *Wilmington Railroad Co.* v. *Reid*, 13 *Wall.* 264.

All the rights and privileges which the company is empowered to exercise were granted to it by its charter upon the terms therein specified. Those terms cannot be changed or altered without the consent of both parties to the charter contract. The right to make further exactions from the company under any pretext involves the power on the part of the state legislature to render the grant to the company futile and of no value, by impositions of like character, to such an extent that the business of the company cannot be prosecuted with profit to the shareholders. That an impost laid upon the entire capital stock is a burden on each share into which such capital stock is divided, in the hands of its several holders, is too clear to be doubted. The proposition that an imposition may be laid upon the aggregate of the capital stock, which is expressly forbidden to be levied upon the several parts which constitute the whole thereof, is so absolutely devoid of merit that it cannot be assented to.

Thus far the discussion has related to the correct interpretation of this contract, as if it were a novel question submitted now for the first time for adjudication. A reference to our own judicial decisions will show incontrovertibly that at the time the Singer charter was granted the words "shall not be liable to any tax or impost whatsoever" (the language of the exempting clause) had received a judicial construction which

must now be accepted as its true meaning in this contract, leaving no place for further interpretation.

As long ago as 1839 the Supreme Court, in *State* v. *Berry*, 2 *Harr.* 80, construed a provision in the charter of the Paterson and Hudson River Railroad Company, "that no further or other tax or impost shall be levied or assessed upon said company."

The same language was again submitted to the Supreme Court for construction in the case of *Camden and Amboy Railroad Co.* v. *Hillegas*, 3 *Harr.* 11.

In these cases the Supreme Court declared that this language "does not exempt the franchises or privileges of the company merely from taxation, but it exempts the company generally from all other taxation to which their property, in common with the property of individuals, would have been subject without such special exemption."

These adjudications were fully concurred in and approved by the Court of Errors and Appeals in *Gardner* v. *State*, 1 *Zab.* 557, and in the more recent case in this court of *State Board* v. *Morris and Essex Railroad Co.*, 20 *Vroom* 193.

After our court of last resort had decided that the language contained in the charter of the Paterson and Hudson River railroad, and like language in the charter of the Camden and Amboy railroad, deprives the state of the right to impose a franchise tax upon either of those companies, this contract with the Singer company was made, in which not only the same language was used, but it was made even stronger in favor of the company by adding the word "whatsoever"—the Singer company "shall not be liable to any tax or impost whatsoever"—manifestly intending to exclude any possible burden on the company except the one previously specified.

It is manifest that both the legislature, when it granted the charter, and the company to which it was granted, understood, from the prior decisions of our courts, that the exempting language was intended to secure exemption from a franchise tax. To affirm the contrary is to assert that the language of the contract was used in a sense the opposite of that which

both parties are presumed to have known was its declared and accepted meaning in the law.

The parties to the contract must be held to have adopted this language with the meaning which had been given to it previously by our highest court, and that is decisive of this controversy; it is not open to question.

The company cannot be brought within the operation of the act of 1892 without impairing the obligation of its contract with the state.

In *Shelby County* v. *Union Bank*, 161 *U. S.* 149, Mr. Justice Peckham, who delivered the opinion of the court, refused to adopt the view expressed by Mr. Justice Swayne in *Farrington* v. *Tennessee, supra,* and that case is chiefly relied upon as a reason for renewing this controversy. The case has no controlling pertinency to the present discussion for two reasons:

*First.* The language construed by Mr. Justice Peckham was as follows: The charter of the company provided "that it should pay to the state an annual tax of one-half of one per cent. on each share of capital stock, which shall be in lieu of all other taxes," and he held that while it limited the amount of tax on each share of stock in the hands of shareholders it did not exempt the corporation. That charter provision differs from the Singer charter in the important respect that the latter not only exempts the shares of stock but it also contains an express limitation on the right to tax the company. From the language used and from that limitation the implication arises in favor of the company's immunity.

*Second.* The clause construed by Mr. Justice Peckham had not, as in the Singer case, prior to its incorporation in the company's charter, been given a definite, established and well-understood meaning by judicial decision in the state where the controversy arose. But if any substantial basis could be found upon which to rest the claim of the state to lay this contested burden upon the company, the state is precluded by the previous judgment of this court from the further litigation of this subject.

A like tax in all respects was laid by the state upon the Singer company in 1891.

The right of the state to levy that tax was controverted by the company, and the case was brought into this court for judgment. It was twice argued before this court by eminent counsel, and considered with great deliberation and care. The decision of this court, reported in 29 *Vroom* 633, is that the charter inhibits the imposition of this tax upon the company. That decision was concurred in by every member of this court (consisting of eleven judges) who heard the arguments in the case. No application for rehearing was made, and that judgment stands as the law of this court and of this case.

It is a judgment between the same parties, in regard to the same subject, involving the construction of the same contract, and presenting precisely the same questions both of law and fact, which have been agitated in this case.

In *New Orleans* v. *Citizens' Bank,* 167 *U. S.* 398, the Supreme Court of the United States said :

" No principle of the law is more inflexible than that which fixes the absolute conclusiveness of such a judgment upon the parties and their privies. Whether the reasons upon which it was based were sound or not, and even if no reasons at all were given, the judgment imports absolute verity, and the parties are forever stopped from disputing its correctness. The estoppel extends to every material allegation or statement which, having been made on one side and denied on the other, was at issue in the cause, and was determined therein.

" It follows, then, that the mere fact that the demand in this case is for a tax for one year, and the demands in the adjudged cases were for taxes for other years, does not prevent the operation of the thing adjudged, if, in the prior cases, the question of exemption was necessarily presented and determined upon identically the same facts upon which the right of exemption is now claimed."

Such is the language of the highest federal court in a tax case, and that its authority should not be doubted is the dictate both of reason and sound policy.

In the case reported in 29 *Vroom* the conditions and questions to be solved were identical with those here presented, the only difference being that in this case the tax is for a subsequent year. Unless the question involved is *res adjudicata*, it can never become so; the unsuccessful litigant may year after year continue to vex his adversary and the court with the same questions which have been decided.

The attempt now to reopen questions which have been once adjudged by this court, by trying to enforce a subsequent tax of the same character, should not be countenanced. It is contrary to the traditions of this court; no precedent can be found for it from the foundation of this court to the present time.

The judgment of this court must be regarded as a finality. It is established to review the decisions of inferior courts and discontented suitors cannot invoke its aid to review and set aside its own deliberate judgments.

The questions sought to be reopened in this case should be regarded as closed and no longer a subject of controversy between these parties, and in accordance with the former judgment of this court the judgment of the Supreme Court setting aside the tax against the company should be affirmed.

VREDENBURGH, J. My reasons for voting to affirm the judgment setting aside the tax in question are founded especially upon the following considerations, viz.: There was certainly one intent of the parties to the above-quoted contract of 1873 about which there is no room for debate, namely, that no real or personal property of this company, when situated outside of the state, should be liable to taxation by the state, and my point is that the present exaction of a per centum upon the amount of the issued capital stock of the company is a form of taxation of such property—that the state is attempting to accomplish by indirection what it cannot do directly. It seems to me, to use the language of authority, that " *a tax upon an incident to a prohibited thing is a tax upon the thing itself, and that if there is a want of power to*

*tax the thing itself there is an equal want of power to tax the incident,"* the broad principle being that the law always regards substance and not form.

It is to be observed that in 1873 the term "real and personal" property of a person or corporation was commonly believed to embrace all property that was legally possible to be subjected to taxation against such person under our constitution. It was not until about the year 1884 that a new species of revenue taxation, which Mr. Justice Field, lately sitting in the Supreme Court of the United States, in the income tax case of *Pollock* v. *Farmers' Loan and Trust Co.,* 157 *U. S.* 592 (1894), called a species of excise tax, was adopted in this state. His language was this: "Excises are a species of tax consisting generally of duties laid upon the manufacture, sale or consumption of commodities within the country or upon certain callings or occupations, often taking the form of exactions for licenses to pursue them."

The act of 1892 in question denominates the present exaction a "license fee or franchise tax," and it is imposed for the purpose of revenue upon the occupation of the company, generally and without restriction to any locality. It is not a tax assessed upon any basis of valuation of the property of the company, but is arrived at annually by the mere multiplication of the amount of the company's issued capital stock by the arbitrary per centum fixed in the act.

It appears by the evidence taken in these proceedings that the extra-territorial property of the Singer company has largely increased since 1873, and now consists of sewing machine factories and their contents, located in Scotland, Austria, Canada, Illinois and Indiana, from the sales of the products of which and of the goods there manufactured, in addition to those of their factory in this state, the business of the company is carried on and their annual earnings and dividends, if any, are realized. This annual license fee or franchise tax is certainly a tax upon the general business of the company. Mr. Justice Bradley, in *Leloup* v. *Mobile*, 127 *U. S.* 645, said: "We fail to see how a state can tax a business occupation when it can-

not tax the business itself. Of course the exaction of a license tax as a condition of doing any particular business is a tax on the occupation, and a tax on the occupation of doing a business is surely a tax on the business."

Undoubtedly, upon the company's failure to pay the tax in question in this suit, its charter would be liable to forfeiture at the instance of the Attorney-General. The payment is, in all respects, compulsory. So that in fixing the scope of the contract the question becomes narrowed to this: Is an annual tax on the business of the company in effect a tax upon the property, with and from the use alone of which that business is done? I find a line of cases holding that "*where the business or occupation consists in the sale of goods, the license tax required for its pursuit is, in effect, a tax upon the goods themselves.*" It was so decided in the case of *Welton* v. *State of Missouri*, 91 *U. S.* 275. There the validity of a license tax which had been exacted by the State of Missouri from dealers in goods which were not the product or manufacture of that state was in question, and the Supreme Court of the United States held that such an exaction must be regarded as *a tax upon the goods themselves.* So in *Cook* v. *Pennsylvania*, 97 *U. S.* 566, it was held that a tax upon the amount of sales of goods made by an auctioneer *was a tax upon the goods sold.* So in *Brown* v. *Maryland*, 12 *Wheat.* 419, 444, it was held that the tax on the occupation of an importer was the same as a tax on imports.

The language of Chief Justice Marshall, in this case, is particularly significant in this connection. He said: " It is impossible to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition which is general as if it were confined to a particular mode of doing the forbidden thing. All must perceive that a tax on the sale of an article imported only for sale is a tax on the article itself."

In *Almy* v. *California*, 24 *How.* 169, it was held that a duty on a bill of lading was the same thing as a duty on the article which it represented. In *Railroad Co.* v. *Jackson*, 7 *Wall.* 262, it was held that a tax upon the interest payable on

bonds was a tax, not upon the debtor but upon the security. And in the latest deliverance of the Supreme Court of the United States on the subject, upon the re-argument of the income tax cases, reported in 158 *U. S.* 601, it was held, after the most careful consideration, that the taxes on the rents and income of real estate are equally as direct taxes as the taxes on the real estate itself, and that the taxes on the income of personal property are equally as direct taxes as the taxes on the personal property itself, the very point of the decision being that there was no legal difference or distinction between taxing property and taxing its income or earnings.

The language of Chief Justice Fuller (157 *U. S.* 581), in his opinion, is that " an annual tax upon the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income."    And in *Iron City Bank* v. *Pittsburg,* 37 *Pa. St.* 343, the Pennsylvania Supreme Court said, " to tax the business which capital performs is to tax the capital.    This is as certainly true as that taxation of capital is a burden on the business in which it is engaged."

Under the tax classification adopted by this court in the case of *Standard Underground Cable Co.* v. *Attorney-General,* 1 *Dick. Ch. Rep.* 270, the assessment in question, speaking in a strict constitutional sense, must be defined to be a franchise tax as distinguished from a property tax.    This, as a legal definition, must be accepted as correct, but while a franchise tax is not one levied directly upon property, and is not, therefore, to be named a " property tax," it is, when imposed in substantial sums for purposes of revenue, as in the present instance, a tax burden upon the income of property. Unless we follow the name and shadow merely, and lose sight of the substance of things, the intent of the parties in the use, at the close of the exemption clause, of the comprehensive words, viz., "shall not be liable to any tax or impost whatsoever," is as clearly expressed as if they had instead appended thereto the words " whether such tax or impost be ascertained in the form of an assessment upon the value of such property or in the form of a franchise tax fixed by a

percentage upon the capital." In either case the governmental burden to be borne by the company and paid out of the earnings of the property for the privilege of using it to carry on its extra-territorial business will be increased, and its net earnings decreased to that extent, in disregard of the real intent and just expectation of the contracting parties.

Now, the State of New Jersey solemnly agreed not to tax the real and personal property of this company not actually in fact within the state, and yet, after long years of acquiescence in the system of property taxation then in vogue, have devised a new experiment of taxation under which, while in the matter of form, indeed, that real and personal property is not made liable by any assessment against it, yet, in the matter of substance the annual income and earnings of that property is to be reached and consumed by the aid of the multiplication table and an arbitrary per centum of the capital stock. Does not this law of 1892, therefore, impair that contract of 1873? The general rule of interpretation of such contracts, having the approval of very high authority, was adopted by this court, in 1890, in the case of *Mount Pleasant Cemetery Co.* v. *Newark,* 23 *Vroom* 539, 541. Chief Justice Beasley, quoting Judge Cooley with approval, then said: "Any law which enlarges, abridges or in any manner changes the intention of the parties discoverable in it, necessarily impairs the contract itself, which is but the evidence of that intention; the manner or degree in which this change is effected can in no respect influence the conclusion." I think that this law of 1892 thus tested cannot stand the test. The exaction annually of this license fee of $4,212 by the compulsory power of the state, though not in form a tax upon the property of this corporation outside of this state, is, in fact, a burden upon the annual earnings of that property, and must of necessity be paid out of them either in whole, or, if not, certainly in large part, and thus falling on them is, in a manner, as I have above argued, a tax upon that property, and to such extent, at least, "abridges" the intention of the parties. The action of the state's taxing department in levying this tax is

not intended to be criticised. It is exercising its right, through its proper officers, of collecting its tax revenues required for the conduct of its affairs. It is met in this effort by a contract of exemption made by the legislature of 1873, a most unwise and impolitic bargain, tending to derange and confuse the tax system of the state and striking a serious blow at its finances. Nevertheless, as it seems to me, this concededly irrepealable contract is binding not only in law, but especially "*in foro conscientiæ*" upon this court of final resort. As the substantive intention of the parties to that contract is, in the view I have above taken, clearly to exempt this property from taxation in every form, and as the history of this litigation shows that this court has already unanimously held to that effect, I think all attempts now to enforce the payment of the tax proposed are oppressive and unconscionable.

Dixon, J. (dissenting). In view of the opinion of this court in *Singer Manufacturing Co.* v. *Heppenheimer*, 29 *Vroom* 633, a vote to reverse the judgment now before us needs explanation, for according to that opinion the judgment should be affirmed. Had the judgment authorized by that opinion been entered of record, and the record been introduced into this cause by pleading or as evidence, it would have been conclusive of the controversy, since the real parties, the state and the Singer company, and the subject-matter, the effect of the sixth section of the company's charter, are the same now as then. But as no such judgment appears, the dispute cannot be deemed *res judicata;* only the opinion can have force, and that on the doctrine of *stare decisis.* Even on that footing, however, it is our duty to follow it, unless there be very cogent reasons to the contrary and a clear manifestation of error. 1 *Kent Com.* 476.

Accepting this as the test, my mind is constrained not to follow that opinion.

The question at issue is one of the utmost importance. The opinion, conceding the intention of the legislature to impose on this company the same franchise tax as on other

like corporations, denies the power of the legislature to do so—yea, goes even deeper and denies the power of the very sovereignty of the state itself, acting upon the fundamental right to make and amend its constitution, to subject this corporation to the same burdens as other similar bodies must bear. A conclusion such as this should be reached only for reasons which are indubitable or acquiesced in only on authority which is imperative.

A perusal of the opinion will indicate that it rests mainly on the proposition that, according to former adjudications in this state (*State* v. *Branin*, 3 *Zab.* 484 ; *State* v. *Bentley*, *Id.* 532 ; *State* v. *Powers*, 4 *Id.* 400), the exemption of a corporation from tax exempted the shares of its stock. On this was predicated the so-called converse, that an express exemption of the shares will also exempt the company ; and the court, finding in the charter a clear exemption of the stock, thence inferred a general exemption of the corporation. The basis of the conclusion was the authority of prior decisions.

An examination of those decisions will show that they also depend largely on authority, the authority of an opinion delivered in the Supreme Court of the United States upon a question finally reviewable in that tribunal. This will appear by the following quotations from the opinion of Chief Justice Green in *State* v. *Branin*, 3 *Zab.* 493 : "The terms of the contract on the part of the state are that no other tax or impost shall be levied or assessed upon the said company. Does this exemption extend to the interest of the individual stockholders in the property of the company ? If this were a new question, I should have some difficulty in arriving at the conclusion that the shares of the individual stockholders were, by virtue of the contract, exempt from taxation, on the grounds that, by the terms of the contract, the exemption is strictly limited to the body corporate; that the property of the individual stockholder is not identical with the property of the corporation and not within the *terms* of the exemption; that in a public grant nothing passes by implication, the contract in all cases of doubt being taken most strongly in favor of

the public and against the grantee, and especially as the fact of giving such construction operates to limit the taxing power of the state. But this question appears to have been decided in favor of the exemption of the stockholder from taxation, under a similar legislative provision, by the Supreme Court of the United States in the case of *Gordon* v. *Appeal Tax Court,* 3 *How.* 133. It was held in that case that an exemption of certain banks from taxation exempted the stockholders of the banks. * * * As the question is one of constitutional law which lies peculiarly within the jurisdiction of that court in the last resort, there is an obvious propriety in adopting their conclusion."

The same case in 3 *How.,* entitled *Gordon* v. *Appeal Tax Court,* is cited as controlling by the other judges, and on this authority rest the earlier decisions in this state.

But in *Shelby County* v. *Union, &c., Bank,* 161 *U. S.* 149, the federal Supreme Court pointed out that the decision in the Gordon case was due to its very special circumstances, and declared as a principle well established that there is a clear distinction between the capital stock of a corporation and the shares of stock of such corporation in the hands of its individual stockholders, and that so separate are these properties and so distinct in their nature that the taxation of the one property is not the taxation of the other. Thereupon the court referred with approval to the case of *Union Bank* v. *State,* 9 *Yerg.* 490, where it was held that, notwithstanding an exemption by the charter of the capital stock of the bank, the state might tax the shares of stock in the hands of individuals, and formally adjudged that a contract exempting from taxation the shares of stock in the hands of individual stockholders did not exempt from taxation the capital stock of the corporation, its surplus or accumulated profits.

Thus, we see that the court which decided the Gordon case has repudiated the doctrine which it was thought to maintain, and by solemn judgment has condemned as unsound the supposed converse of that doctrine which formed the staple of this court's opinion.

The case of Shelby County *v.* Union, &c., Bank was decided March 2d, 1896, but was not known of by this court when, shortly afterwards, the opinion in Singer Manufacturing Co. *v.* Heppenheimer was announced. Had this court then learned, as we now have learned, that the tribunal, whose authority had been deemed the all-sufficient support for the principle invoked, utterly refused to sanction the principle, but proclaimed and enforced its opposite, it is safe to say the case in hand would have been differently dealt with, even if on other grounds the same conclusion had been reached. In resting that conclusion on authority there was manifest error, and I therefore think the rule of *stare decisis* does not preclude me from considering the present judgment as *res nova*.

The true test to be applied in examining the validity of a claim of exemption from taxation was declared by Chief Justice Green in language already quoted. In *Chicago, Burlington and Keokuk Railroad Co.* v. *Guffey,* 120 *U. S.* 569, 575, Mr. Justice Harlan declared it in these words: "It is the settled doctrine of this court that an immunity from taxation by a state will not be recognized unless granted in terms too plain to be mistaken." And in *Bank of Commerce* v. *Tennessee,* 161 *Id.* 134, 146, Mr. Justice Peckham said: "Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of anyone to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded on plain language. There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well-founded doubt is fatal to the claim; no implication will be indulged in for the purpose of construing the language used as giving the claim for exemption where such claim is not founded upon the plain and clearly-expressed intention of the taxing power."

Another general proposition may be premised in the words of Chief Justice Waite (*Tennessee* v. *Whitworth,* 117 *U. S.* 129, 136): "In corporations, four elements of taxable value are

sometimes found—*first,* franchises; *second,* capital stock in the hands of the corporation; *third,* corporate property; and *fourth,* shares of the capital stock in the hands of the individual stockholders."

Guided by these lights, I turn to the exemption now under examination. It is thus expressed : " So long as the said corporation shall invest and keep invested in real estate within this state the sum of five hundred thousand dollars, the real and personal property of the said corporation not actually in fact within the State of New Jersey, and the stock of the said corporation held or owned by any of its stockholders shall not be liable to any tax or impost whatsoever."

There is here an exemption of part of the third element—corporate property—and of all of the fourth element, shares held by stockholders, as classified by Chief Justice Waite. It is impossible to contend that any exemption of the other elements, the franchises and the capital stock in the hands of the corporation, is expressly granted, or to deny that a claim to such exemption must rest on an implication which at best is doubtful, and therefore inadmissible. Such, to my mind, is the simple solution of the question at issue, when we are freed from the notion that an exemption of shares involves an exemption of the company.

But, even on the supposition that a mere exemption of the shares, standing alone, creates an exemption of the corporation and its property, I do not think such an exemption can be derived from the express terms of this charter, for the express exemption of the corporate property not within this state indicates that the exemption of the shares in this case was not understood as implying an exemption of the company or its property. The course of thought suggested by reading the charter is that, first, the legislature considered what immunity should be granted to the corporation itself, and thereupon determined that the real and personal property of the company not actually within the state should not be liable to any tax or impost whatsoever, and secondly, it considered what immunity should be granted to the stockholders, and determined that their shares of stock should be likewise exempt.

In the former opinion of this court it is said that the express exemption of the corporate property outside of the state was inserted in order that the real and personal property of the company in the state might be taxed here; that that was its apparent purpose and entire effect.   With deference, I cannot but think that this is a very strange construction.   It means that the legislature, understanding one clause of the charter to import a universal exemption, determined to narrow its scope by granting a further exemption.   If the legislature had thought that an exemption of stock implied an exemption of the company and its property, and had intended to preserve only a right to tax the property in this state, how much simpler and more natural would have been an expressed exemption of the stock in the hands of the stockholders, with a proviso that that should not imply an exemption of the property within the state.   Then it could have been reasonably argued that the legislature contemplated the exemption itself as one that might cover the corporation and its property, and the proviso was designed to limit its effect.   But to discern that train of thought in the form of words employed in this charter is quite beyond my power of insight.

It is further insisted that the real and personal property of the company not actually within the state could not be subjected to direct taxation by the authority of this state, and therefore the exemption granted must have been designed to prevent any indirect taxation thereon; and since the present tax, if exacted, must come out of the mass of the company's property, it is an indirect tax upon the property outside of the state, and so violates the terms of the exemption.

So far as concerned the personal property of the corporation outside of the state, it would certainly be, on general principles, subject to the state's power of taxation, and the framers of this exemption may have doubted whether the state's power might not also reach the real property of its own creatures, and therefore have coupled both classes of property in the same provision.   At any rate, there is nothing

unusual in an unnecessary precaution. But, however this may be, the things exempted are *property,* and if the present tax be prohibited it must be because it is a tax on property. If that be its nature it does not need so much argument to prove its illegality, for, by our constitution, property when taxed must be taxed according to its true value, and, confessedly, this impost is not graduated by that standard. But, under the decisions of this court not questioned, the tax or fee now resisted is not within the constitutional provision, because it is not a tax on property. *Standard Cable Co.* v. *Attorney-General,* 1 *Dick. Ch. Rep.* 270; *Tidewater Pipe Co.* v. *Assessors,* 28 *Vroom* 516; *affirmed on error,* 30 *Id.* 269. There is, of course, a sense in which every tax or governmental charge requiring the payment of money is an imposition upon property, for every such requisition, whether it be a property tax, or a stamp duty, or a poll tax, or a license fee, must be met out of property. But by a tax upon property is meant only such a tax as is assessed either on property, as are generally our real estate taxes, or on the owner because of his property, as are our personal estate taxes. If the present charge is not a tax on property in either sense, within the constitutional injunction, which should be construed liberally, it cannot be a tax or impost on property, within the exemption, which must be construed strictly, and unless it be a tax or impost on property it is not affected by the exemption.

But even if this claim that something beyond property taxes is prohibited, it would be satisfied to all reasonable intents, under the present taxing act, by deducting from the amount of the company's capital stock on which the license fee is computed, the value of the company's real and personal property not actually in fact within this state. Such a deduction, on this hypothesis, ought to have been made in the Supreme Court in accordance with the act of March 23d, 1881 (*Gen. Stat., p.* 3404), instead of the reversal of the entire charge.

One other point deserves mention, not perhaps for its

intrinsic merit, but because of the earnestness with which it is pressed. It is said this charter was accepted by the company in reliance upon the decisions of our Supreme Court above mentioned, and in the belief that under them the company secured immunity from all taxation except that which might be levied on its property within the state; consequently it is asserted the effort of the state to collect the present charge is a breach of faith.

The groundlessness of the suggestion that this charter was framed with reference to those under consideration in the reported cases will plainly appear on comparing its provisions with theirs. The charter construed in State *v.* Branin enacted that the company should pay to the state a certain sum for each passenger and each ton of freight transported, *and that no other tax or impost should be levied or assessed upon the company;* the charter construed in State *v.* Bentley enacted that the company should pay to the state annually a tax of one-half of one per centum on the cost of the road, *and that no other tax or impost should be levied or assessed upon the company;* and the charter construed in State *v.* Powers enacted *that all the lands, tenements, hereditaments, goods and chattels to the society belonging should be free and exempt from all taxes, charges and impositions whatsoever under the authority of this state, whether for state or for county uses or for any other use whatsoever.* On these provisions the court held that the shares in the hands of stockholders were not taxable. There is no similarity between the language of those charters and that of the Singer company. In each of the earlier charters we find a general exemption of the company or its property and no reference whatever to the stock in the hands of stockholders; in the Singer charter we have no exemption of the company itself, a very limited exemption of the company's property and an express exemption of the shares of stock in the hands of stockholders. In each one of the earlier charters there exists also a provision for a definite mode of taxation, so that if the maxim " *expressio unius exclusio alterius est* " were applied every other mode would be prohibited, while here no particular mode of taxation is prescribed but definite kinds

of exemption are granted, so that the application of the maxim forbids the claim of any further exemption and leaves the range of taxation unimpaired. It appears incredible that the phraseology of the Singer charter was adopted on the faith of a meaning ascribed to the charters construed in the reported cases. Had these earlier decisions been in the minds of the parties and their purpose been to secure through them for this charter the significance now set up, the plain statement would undoubtedly have been that the property of the company actually within the state should be subject to taxation, but that no other tax or impost whatsoever should be levied or assessed upon the company.

Instead of charging upon the state a breach of faith for its attempt to exact this license fee, it would be much more reasonable to charge such a breach against the company for asserting the unalterability of its exemption granted in 1873, in view of the act of February 14th, 1846 (*Pamph. L.*, *p.* 16), and the decision of this court in 1867 (*Warren Railroad Co. v. Person*, 3 *Vroom* 566), that by force of that act there was, in legal effect, incorporated in every charter granted after 1846 a provision that it should be subject to alteration, suspension or repeal, in the discretion of the legislature.

But I do not consider the question of good faith on either side to be involved. The state demands of the company that it shall bear the same burden as other similar corporations, and the company denies the legality of the demand. Whether the demand is legal or not, is the sole controversy, and the decision turns on the true meaning and force of the company's charter. On that and that only do I predicate my vote to reverse the present judgment.

*For affirmance* (and concurrence in opinion of Van Syckel, J.)—The CHANCELLOR, CHIEF JUSTICE, DEPUE, LUDLOW, VAN SYCKEL, ADAMS, BOGERT, HENDRICKSON, NIXON. 9.

*For affirmance*—VREDENBURGH. 1.

*For reversal*—COLLINS, DIXON. 2.